# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| JEFFREY MCGINNES, *et al.*, | : | Case No. 1:18-cv-326 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| FIRSTGROUP AMERICA, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS (Docs. 37, 38)

This civil action is before the Court on two motions to dismiss: (1) the motion to dismiss filed by Defendants FirstGroup America, Inc. ("FirstGroup") and the FirstGroup America, Inc. Employee Benefits Committee (the "Committee") (collectively, the "FirstGroup Defendants") (Doc. 37); and (2) the motion to dismiss filed by Defendant Aon Hewitt Investment Consulting, Inc. ("Hewitt")[1] (collectively with the FirstGroup Defendants, "Defendants") (Doc. 38). Also before the Court are the parties' responsive memoranda. (Docs. 39, 40, 42, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 57, 58).

## I. FACTS <u>AS ALLEGED</u> BY PLAINTIFF

Plaintiffs Jeffrey McGinnes, Wendy Berry, Lorri Hulings, and Kathleen Sammons (collectively, "Plaintiffs") have filed suit against Defendants under the Employee Retirement Security Income Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.*

---

[1] Hewitt's motion to dismiss simply joins in the FirstGroup Defendants' motion to dismiss Count II only.

("ERISA"), on behalf of the FirstGroup America, Inc. Retirement Savings Plan (the "Plan"). (Doc. 35 at ¶ 1). In short, Plaintiffs allege that Defendants have breached the fiduciaries duties imposed on them by ERISA, by replacing 95% of the Plan's well-established investments with a series of new/untested funds developed by Hewitt in 2013, and by stubbornly adhering to this imprudent/disloyal investment decision despite significant losses to the Plan.[2] (*Id.* at ¶¶ 1–2, 52).

*Infra*, the Court sets forth the material factual allegations in Plaintiffs' Amended Complaint. For the purposes of this Order, the Court must view the Amended Complaint in a light most favorable to Plaintiffs and take all well-pleaded factual allegations in the Amended Complaint as true. *Tackett v. M & G Polymers*, *USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009).[3]

---

[2] Notably, Plaintiffs seek to bring this lawsuit in both their individual capacities and on behalf of the following class: "[a]ll participants and beneficiaries of the [Plan] at any time on or after October 1, 2013 who had any portion of their account invested in Hewitt['s] [f]unds, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plan's investment or administrative functions." (Doc. 35 at ¶ 84).

[3] In their motion to dismiss briefing, the parties reference specific portions of FirstGroup's 401(k) plan, FirstGroup's Committee minutes, an investment management agreement, and certain publicly filed disclosures. (*See* Docs. 37-1, 39, 40). These documents are not attached to Plaintiffs' Amended Complaint. (*See* Doc. 35). However, they have been submitted to the Court in connection with the FirstGroup Defendants' motion to dismiss. (*See* Doc. 37-2). On careful review, these documents are sufficiently referenced in and integral to Plaintiffs' claims to warrant consideration at the 12(b)(6) stage. (*See* Doc. 35 at ¶¶ 1, 67, 71, 74); *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) ("[W]hen a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment."). As such, the Court will cite them in this Order where/as appropriate.

### A. FirstGroup establishes a defined contribution Plan for its employees, full of well-established funds

FirstGroup established the FirstGroup America, Inc. Retirement Savings Plan for its employees in 2009. (Doc. 35 at ¶ 24). The Plan is an employee benefit plan within the meaning of 29 U.S.C. § 1002(2) and a qualified "401(k)" plan under 26 U.S.C. § 401(k). (*Id.*; Doc. 37-3 at 9). The Plan helps eligible FirstGroup employees save money for retirement. (Doc. 35 at ¶ 25). Plaintiffs are all current/former participants in the Plan. (*Id.* at ¶¶ 16–19). The FirstGroup Defendants are both fiduciaries of the Plan.[4] (*Id.* at ¶¶ 20–21). And, since 2009, Hewitt has provided investment advisory services to the Plan. (*See id.* at ¶ 22).

Between 2009 and 2013, Defendants stocked the Plan with a diverse portfolio of well-established funds (the "Original Funds"). (*Id.* at ¶¶ 7, 25, 54–56). Plan participants had the opportunity to choose between: a "target date" option managed by T. Rowe Price; a stable value fund managed by Wells Fargo; a passive index fund designed to mirror the S&P 500; and eight other funds actively managed by highly experienced companies. (*Id.* at ¶ 25 (listing highly "experienced [funds] managers," such as American Funds, Dodge & Cox, and others)).

---

[4] To be precise, FirstGroup is the Plan's sponsor, administrator, and named fiduciary. (Doc. 35 at ¶ 20). As the Plan's sponsor, administrator, and named fiduciary, FirstGroup exercises "discretionary control with respect to the administration of the Plan and management and disposition of Plan assets." (*Id.*) FirstGroup has delegated certain of its Plan-related duties to the Committee. (*Id.* at ¶ 21). Per this delegation, the Committee has the power to select, monitor, and remove "investments, investment managers, and investment consultants." (*Id.*)

The Original Funds served the Plan participants well. (*See id.* at ¶ 7; *see also* Doc. 39 at 10). Each of the Original Funds had a strong, Global Investment Performance Standards ("GIPS")-compliant, record of performance.[5] (Doc. 35 at ¶ 55). Each of the Original Funds consistently beat their 10-year performance benchmarks. (*Id.* at ¶¶ 55–56; *see also id.* at ¶ 9). And moreover, each of the Original Funds aligned with the terms of an Internal Policy Statement, maintained by FirstGroup between March 2012 and February 2013 (the "2012 IPS"). (*Id.* at ¶¶ 11–12, 62, 67).

In relevant part, that 2012 IPS provided as follows:

> Investment managers or funds ***shall be chosen*** and evaluated using the following criteria:
> - Performance Record – Historical performance results will be compared against a backdrop of an applicable peer group and appropriate market index benchmarks. The manager or fund should have a performance record that suggests results that will meet the Plan's investment goals, including a record that is:
>   > ***at least 3 years long, with longer records of five to seven years being materially important*** . . . .

(Doc. 35 at ¶ 62 (emphasis added); *see also* Doc. 35-1 at 6).[6]

---

[5] The GIPS "are a well-recognized and respected series of performance tracking and reporting standards designed to ensure fair and accurate representation of historical investment performance by asset managers that ha[ve] been verified by a third party." (Doc. 35 at ¶ 55 n.16).

[6] According to the allegations in the Amended Complaint, Defendants adopted the 2012 IPS in March 2012. (Doc. 35 at ¶ 62). Then, in February 2013, Defendants adopted a different, revised investment policy statement. (*Id.* at ¶ 67). The February 15, 2013 Committee minutes submitted to the Court align with these allegations. (Doc. 37-7 at 4). According to those minutes, the "Committee adopted [a] revised Investment Policy Statement" at a February 15, 2013 meeting, named: FirstGroup America, Inc., FirstGroup America 40l (k) Savings Plan, Investment Policy Statement, Revised. (*Id.*) Per the foregoing, FirstGroup maintained the 2012 IPS between its adoption in March 2012 and its amendment in February 2013. (*See id.*). The February 2013 revision has not been provided the Court. (*Accord* Doc. 35 at ¶ 67 n.32 (indicating that Plaintiffs have not obtained a copy of the February 2013 revision)).

4

### B. The FirstGroup Defendants agree to overhaul the Plan's well-established funds with new/untested funds offered by Hewitt

Notwithstanding the Plan's strong performance, Plaintiffs allege that everything "changed" in 2013.  (Doc. 35 at ¶ 7).  In 2013, Hewitt introduced its own line of investment products to the 401(k) market (the "Hewitt Funds").  (*Id.*)  And, in connection with the introduction, Hewitt started marketing its new funds to its consulting clients (like the FirstGroup Defendants), in an effort to leverage its existing relationships into new investors.  (*Id.* at ¶¶ 8, 49).  As the funds were new/untested, they did not have an established track record.  (*Id.* at ¶ 57).  Moreover, as Hewitt was the funds' developer, Hewitt had a substantial interest in getting its clients to invest in them.  (*Id.* at ¶ 49).

Most of Hewitt's clients rejected the Hewitt Funds, presumably due to their new/untested nature.  (*Id.* at ¶ 8).  However, the FirstGroup Defendants were "not as discerning."  (*Id.*)  Hewitt pitched a massive Plan overhaul to the Committee at a May 22, 2013 meeting.  (*Id.* at ¶ 69).  And, following that single pitch, the FirstGroup Defendants agreed to both: (1) appoint Hewitt as the investment manager for the Plan; and (2) overhaul the Plan lineup to include the Hewitt Funds (instead of the Original Funds).  (*Id.* at ¶¶ 68–72; *see also* Doc. 37-8 at 3–4; Doc. 39 at 14).

Notably, the Committee's May 22, 2013 minutes do not indicate that the FirstGroup Defendants retained an independent consultant before agreeing to the Plan overhaul; nor do the Committee's May 22, 2013 minutes explain why the Plan overhaul would be in the best interests of the Plan participants.  (Doc. 37-8 at 3–4).  Instead, they merely provide that the Committee "discussed and considered" the information presented

by Hewitt, then determined that Hewitt "should be retained to be the investment manager for the [] Plan[,] with the authority to select, monitor[,] and manage the [] Plan's investments . . . ." (*Id.* at 4).[7]

On August 29, 2013, Defendants executed an investment management agreement (the "IM Agreement"), giving Hewitt the "exclusive authority" to select/monitor the Plan's investment menu, sub-advisors, and investment options. (Doc. 37-6 at 2, 10). Then, on September 24, 2013, Defendants executed a supplemental letter amendment (the "Letter Amendment"), confirming that Hewitt could carry out its duties by "selecting exclusively from among the [Hewitt] Funds." (Doc. 35-2 at 3). In other words, the FirstGroup Defendants explicitly authorized Hewitt to replace ***all*** the Plan's Original Funds with the Hewitt Funds. (*Id.; see also* Doc. 35 at ¶ 71).

### C. Hewitt replaces 95% of the Plan's well-established funds with its own new/untested products

Hewitt assumed its role as investment manager on October 1, 2013 (Doc. 37-6 at 2), and, that same day, Hewitt replaced the Original Funds with the Hewitt Funds (Doc. 35 at ¶ 26). In accordance with the Letter Amendment, Hewitt did not just replace *some* of the Plan's Funds; instead, ***Hewitt swapped over 95% of the Plan's existing assets for its own new/untested products***. (*Id.* at ¶ 52). Indeed, based on the allegations in the Amended Complaint, Hewitt replaced an Original Fund with a Hewitt Fund wherever it

---

[7] Contradictorily, the same minutes provide that, even as the Committee was approving changes to the Plan, the Committee determined "that it would be in the best interests of the participants and beneficiaries in the [] Plan to make no changes to the investments in the [] Plan at this time." (*Id.* at 3; *see also* Doc. 35 at ¶ 69).

was possible to do so.  (*Id.* at ¶ 61 n. 28).  This resulted in a transfer of <u>over $250 million</u> in Plan assets to the Hewitt Funds.  (*Id.* at ¶ 61).

To illustrate, Plaintiffs have presented the following table of the Plan's lineup both before and after the 2013 overhaul:

| Before | After |
|---|---|
| **Target Date Funds**<br> - T. Rowe Price Retirement Series<br>**Actively-Managed Funds**<br> - Wells Fargo Advantage Small Cap Value Fund<br> - American Funds EuroPacific Growth Fund<br> - Artisan Mid Cap Value Fund<br> - Baron Growth Fund<br> - Dodge & Cox Stock Fund<br> - Mainstay Large Cap Growth Fund<br> - Morgan Stanley Mid Cap Growth Portfolio<br> - PIMCO Total Return Fund<br>**Passively-Managed Funds**<br> - Wells Fargo S&P 500 Index Fund<br>**Capital Preservation Option**<br> - Wells Fargo Stable Return Fund | **Target Date Funds**<br> - Aon Hewitt Retirement Series<br>**Actively-Managed Funds**<br> - Aon Hewitt Core Plus Bond Fund<br> - Aon Hewitt Inflation Strategy Fund<br> - Aon Hewitt Large Cap Equity Fund<br> - Aon Hewitt Non-U.S. Equity Fund<br> - Aon Hewitt Small & Mid Cap Equity Fund<br>**Passively-Managed Funds**<br> - None<br>**Capital Preservation Option**<br> - Wells Fargo Stable Return Fund |

(*Id.* at ¶ 51).

As depicted in the table, the 2013 overhaul represented a massive change to the Plan's lineup.  (*Id.*)  Following the 2013 overhaul, Plan participants had no non-Hewitt options in the Plan lineup other than a low-yielding capital preservation fund.  (*Id.* at ¶ 52).  Moreover, Plan participants were left without any passively managed index fund option, as each Hewitt Fund is primarily actively managed.  (*Id.*)  Notably, this full-sale adoption of the Hewitt Funds occurred despite the fact that, at the time of the 2013 overhaul, no other 401(k) plan in the country had agreed to use them.  (*Id.* at ¶ 8).

According to Plaintiffs, the results of the 2013 overhaul have been "disastrous." (*Id.* at ¶ 2).  Hewitt's Target Date Funds portfolio has underperformed its weighted 10-year benchmark by an average of 1.49% per year, and the Plan funds it replaced by

2.76%.  (*Id.* at ¶ 74).  Moreover, Hewitt's remaining portfolio has underperformed its weighted 10-year benchmark by an average of 1.12% per year, and the Plan funds it replaced by 0.76%.  (*Id.* at ¶ 75).  Amplified across the $250 million invested in the Hewitt Funds, this underperformance has allegedly resulted in tens of millions of dollars in losses.  (*Id.* at ¶ 13).

### D. Plaintiffs commence this lawsuit, then Defendants file their respective motions to dismiss

Plaintiffs filed suit against Defendants on May 11, 2018 (Doc. 1), then amended their Complaint on August 3, 2018 (Doc. 35).

In their Amended Complaint, Plaintiffs allege that Defendants have breached the fiduciary duties set forth in ERISA by imprudently "engaging in a radical redesign of the Plan's investment menu that was designed to benefit Hewitt . . . rather than the participants and beneficiaries of the Plan, and [by] stubbornly adher[ing] to this imprudent menu design in spite of evidence that it has caused significant and ongoing damage to the Plan."  (*Id.* at ¶ 1).

Specifically, Plaintiffs' Amended Complaint contains three Counts:

**Count I**:   Plaintiffs allege that Defendants have breached the duties of prudence and loyalty under 29 U.S.C. § 1104(a)(1)(A)–(B).

**Count II**:   Plaintiffs allege that Defendants have breached the duty to follow plan documents under 29 U.S.C. § 1104(a)(1)(D).

**Count III**:   Plaintiffs allege that FirstGroup has breached its duty to monitor the Plan's other fiduciaries under the standards set forth in ERISA.

(Doc. 35 at ¶¶ 92–118).

8

On September 7, 2018, Defendants filed their respective motions to dismiss Plaintiffs' Amended Complaint. (Docs. 37, 38).

The FirstGroup Defendants seek to dismiss the Amended Complaint in its entirety. (Doc. 37-1). The FirstGroup Defendants advance two arguments in support of dismissal. (*Id.*) First, the FirstGroup Defendants argue that the "majority" of Plaintiffs' Counts are barred by ERISA's statute of limitations. (*Id.* at 7, 11–14). Second, the FirstGroup Defendants argue that dismissal is warranted under Rule 12(b)(6) as none of Plaintiffs' Counts states a claim on which relief can be granted. (*Id.* at 7, 14–25).

Hewitt, for its part, only seeks to dismiss Count II of the Amended Complaint. (Doc. 38). Hewitt does not advance any independent arguments in support of dismissal. (*Id.* at 1). Instead, Hewitt "adopts" the arguments presented by the FirstGroup Defendants. (*Id.*)

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*.

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).[8]

---

[8] The parties dispute whether it is appropriate to apply the 12(b)(6) standard in accordance with the guidance articulated in *Braden v. Wal-Mart Stores*, 588 F.3d 585, 595–98 (8th Cir. 2009) (describing how the 12(b)(6) standard should be applied in ERISA cases given ERISA plaintiffs' limited access to information). (*See* Doc. 39 at 9; Doc. 40 at 13). The Court does not rely on *Braden* in reaching the conclusions set forth in this Order. As such, the Court will not address the parties' arguments regarding *Braden* in the context of this Order.

# III.  ANALYSIS

## A.  The Limitations Argument

The first issue is whether any of Plaintiffs' claims are barred by ERISA's statute of limitations.  (Doc. 37-1 at 7, 11–14).  As set forth *infra*, the Court concludes that it is too early to tell.

ERISA's statute of limitations provides that a breach of fiduciary duty action cannot be commenced more than "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  29 U.S.C. § 1113(2).[9]  In the Sixth Circuit, the "actual knowledge" required to trigger § 1113(2)'s three-year period is "actual knowledge of the underlying conduct giving rise to the alleged violation . . . , rather than [actual] knowledge that the underlying conduct violates ERISA."  *Wright v. Heyne*, 349 F.3d 321, 331 (6th Cir. 2003).

Moreover, the United States Supreme Court has held that:

> As presently written . . . , § 1113(2) requires ***more than evidence of disclosure alone*** [to establish "actual knowledge" on the part of the plaintiff].  That all relevant information was disclosed to the plaintiff is no doubt *relevant* in judging whether he gained knowledge of that information.  To meet § 1113(2)'s "actual knowledge" requirement, however, ***the plaintiff must in fact have become aware of that information***.

*Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020) (citation omitted and emphasis altered).

---

[9] If actual knowledge does not exist, a six-year limitations period applies.  29 U.S.C. § 1113.  At this point, there does not appear to be any dispute that Plaintiffs filed suit within six years of the fiduciary breaches alleged in the Amended Complaint.  (*See generally* Docs. 35, 37-1, 39, 40).

Thus, the key inquiry, in determining whether actual knowledge exists under § 1113(2), is not whether the defendant has fairly disclosed all relevant information, but whether the plaintiff is actually aware of that relevant information.  *See id.* at 778 (stating that even a reasonably diligent "plaintiff will not necessarily be aware of all facts disclosed to him"); *see also Chavis v. Plumbers & Steamfitters Local 486 Pension Plan*, No. 1:17-CV-2729, 2020 WL 1503679, at *35 (D. Md. Mar. 27, 2020) (noting that, "[i]f a plaintiff is not aware of a fact, he does not have 'actual knowledge' of that fact however close at hand the fact might be" (citing *Sulyma*, 140 S. Ct. at 777)).

Notably, a statute of limitations (like § 1113(2)) is an affirmative defense, which the **defendant** has the burden to demonstrate.  *See Newberry v. Serv. Experts Heating & Air Conditioning, LLC*, 806 F. App'x 348, 361 (6th Cir. 2020).  Given this burden, a limitations argument is generally inappropriate in the context of a motion to dismiss. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).  Such an argument will only prevail when "the allegations in the complaint [] affirmatively show that the [plaintiff's] claim is time-barred . . . ."  *Newberry*, 806 F. App'x at 361 (quotation marks and citation omitted).

Here, Plaintiffs filed suit against Defendants on May 11, 2018.  (Doc. 1).  And Plaintiffs' Amended Complaint contains three counts: (1) breach of the duties of prudence and loyalty under 29 U.S.C. § 1104(a)(1)(A)–(B); breach of the duty to follow plan documents under 29 U.S.C. § 1104(a)(1)(D); and (3) failure to monitor Plan fiduciaries under the standards set forth in ERISA.  (Doc. 35 at ¶¶ 92–118).  There does not appear to be any dispute that the "majority" of the conduct underlying these Counts

occurred in late 2013. (*See, e.g.*, Doc. 37-1 at 13; Doc. 39 at 23–25). Thus, the key question before the Court is *when* Plaintiffs gained actual knowledge of that underlying conduct. If the requisite knowledge existed prior to May 11, 2015, a limitations issue will exist.

The FirstGroup Defendants argue that Plaintiffs knew about the material facts giving rise to their claims prior to May 11, 2015. (Doc. 37-1 at 11–14). The FirstGroup Defendants do not point the Court to any specific allegations in the Amended Complaint which establish actual knowledge on the part of Plaintiffs. (*Id.*) Instead, the FirstGroup Defendants present the Court with several written disclosures "made available" to Plaintiffs between 2013 and 2016 (through public filings). (*See id.* at 13; *see also* Doc. 37-5 (containing various Form 5500s)). And the FirstGroup Defendants assert that these written disclosures contained all the information about the Plan's fiduciaries/lineup that Plaintiffs needed to file suit. (*See* Doc. 37-1 at 13).

On careful review, the FirstGroup Defendants' argument is unpersuasive at this time. While the FirstGroup Defendants' submissions indicate that the FirstGroup Defendants have *disclosed* material information to Plaintiff, *Sulyma* unequivocally notes that disclosure, alone, is insufficient to establish actual knowledge under § 1113(2). *Sulyma*, 140 S. Ct. at 777. And in that regard, the FirstGroup Defendants have *not* pointed the Court to any allegations/evidence establishing that Plaintiffs actually read (or were otherwise aware) of the disclosures' contents. (Doc. 37-1 at 11–14). Absent such a showing (*i.e.*, one of actual *awareness*), the Court cannot conclude that the FirstGroup Defendants' written disclosures provided Plaintiffs with actual knowledge under

§ 1113(2)—even if the Court assumes that the written disclosures contained all the underlying facts necessary to do so.[10]

It may well be that, as this case progresses, additional information establishes that Plaintiffs knew too much too soon, and thus, that ERISA's statute of limitations ran before the 2018 filing of this action. *See* 29 U.S.C. § 1113(2). However, additional evidence is needed to establish what Plaintiffs knew and when they knew it. And such evidence is neither before the Court nor appropriate to consider in the context of a Rule 12(b)(6) motion. *Cf. Bernaola v. Checksmart Fin. LLC*, 322 F. Supp. 3d 830, 836 (S.D. Ohio 2018) (noting that determining whether actual knowledge existed "required facts, not just the pleadings"). Accordingly, the Court cannot conclude that Plaintiffs' claim are barred by § 1113(2) at this preliminary juncture.

## B.  The 12(b)(6) Argument

The second issue is whether any of Plaintiffs' Counts states a claim on which relief can be granted. (Doc. 37-1 at 14–25). As set forth *supra*, Plaintiffs' Amended Complaint contains three Counts: in Count I, Plaintiffs allege that Defendants have breached the duties of prudence and loyalty under 29 U.S.C. § 1104(a)(1)(A)–(B); in Count II, Plaintiffs allege that Defendants have breached the duty to follow plan documents under 29 U.S.C. § 1104(a)(1)(D); and in Count III, Plaintiffs allege that

---

[10] Notably, in a supplemental filing, the FirstGroup Defendants additionally argue that actual knowledge exists, because Plaintiffs "nowhere deny knowing" several of the facts contained in the written disclosures. (Doc. 54 at 1–2). However, a limitations argument is "an affirmative defense which the defendant has the burden to demonstrate." *Newberry*, 806 F. App'x at 361. Given this burden, the FirstGroup Defendants cannot prevail on their limitations argument merely by claiming that Plaintiffs have failed to adequately plead ignorance.

FirstGroup has breached its duty to monitor the Plan's other fiduciaries under the standards set forth in ERISA. (Doc. 35 at ¶¶ 92–118). On careful review, the Court concludes that Counts I and III state a claim; but Count II does not.

### 1. *Count I: breach of the duties of prudence and loyalty under 29 U.S.C. § 1104(a)(1)(A)–(B)*

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). ERISA accomplishes this purpose by, *inter alia*, imposing the duties of prudence and loyalty on plan fiduciaries. *See* 29 U.S.C. 1104(a)(1); *Metyk v. KeyCorp*, 560 F. App'x 540, 542 (6th Cir. 2014); *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1061 (M.D. Tenn. 2018). ERISA sets forth these duties as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan;
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. § 1104(a)(1).

In Count I, Plaintiffs allege that Defendants have breached the duties of prudence and loyalty under 29 U.S.C. § 1104(a)(1)(A)–(B). (Doc. 35 at ¶¶ 92-104). Specifically,

Plaintiffs allege that no "prudent fiduciary acting solely in the interest of Plan participants and beneficiaries would [] have selected or retained [the] Hewitt Funds for the Plan, given their lack of an established track record, poor performance history after they were launched, . . . and other undesirable attributes." (*Id*. at ¶ 97).

The FirstGroup Defendants argue that Count I fails to state a claim for three reasons: (a) because Count I fails to contain sufficient plausible facts to state a duty of prudence claim; (b) because Count I fails to contain sufficient plausible facts to state a duty of loyalty claim; and (c) because ERISA's safe harbor shields the FirstGroup Defendants from any Count I-related liability. (Doc. 37-1 at 14–21). The Court finds each of these arguments unpersuasive for purposes of Rule 12(b)(6).

a. <u>Duty of prudence</u>

First, the FirstGroup Defendants argue that Count I fails to contain sufficient plausible facts to state a duty of prudence claim. (Doc. 37-1 at 16–20). More specifically, the FirstGroup Defendants argue that Plaintiffs fail to state a claim with regard to the ***selection*** of the Hewitt Funds, because "ERISA does not prohibit the selection of [] 'new' fund[s]," because ERISA "allow[s] plan fiduciar[ies] to offer affiliated" funds, and, in any event, because the management of any funds was a matter of FirstGroup's discretion. (*Id.* at 17–19). The FirstGroup Defendants further argue that Plaintiffs' allegations fail to state a claim with regard to the ***retention*** of the Hewitt funds, because, notwithstanding the "hindsight"-oriented allegations the Amended Complaint, there is no indication that the Hewitt Funds performed "so poorly as to require their removal." (*Id.* at 19–20).

16

In short, the FirstGroup Defendants ask the Court to find that no breach has occurred simply because the FirstGroup Defendants were authorized to select/offer new/affiliated funds, and because the end result of the 2013 overhaul was not a complete disaster. (*See id.* at 17–20). This argument misses the mark.

"The test for determining whether a fiduciary has satisfied his duty of prudence is whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384 (6th Cir. 2015) (quoting *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 723 (6th Cir. 2000)) (emphasis added). "In other words, [the Court] must 'focus . . . on whether the fiduciary engaged in a reasoned decision[-]making process, consistent with that of a prudent man acting in [a] like capacity.'" *Id.* (quoting *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014)) (emphasis in *Pfeil*).

Notably, the duty of prudence applies both to a fiduciary's initial decision to retain an investment and the fiduciary's subsequent conduct in monitoring that investment. *Karpik v. Huntington Bancshares Inc.*, No. 2:17-CV-1153, 2019 WL 7482134, at *4 (S.D. Ohio Sept. 26, 2019) (stating that the duty of prudence "imposes on a fiduciary the 'continuing duty to monitor trust investments and remove imprudent ones.'" (quoting *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015))).

Here, Plaintiffs' allegations—which this Court must assume to be true for purposes of a Rule 12(b)(6) motion—do not merely assert that the FirstGroup Defendants made a bad investment decision, but rather that the FirstGroup Defendants' decision-

making process was flawed. (*See* Doc. 35 at ¶ 100). In other words, Plaintiffs allege that, taken as a whole, the circumstances surrounding the Hewitt Funds investment raised sufficient red flags, such that they should have triggered the FirstGroup Defendants' duty to conduct a more fulsome investigation. (*See id.*). And Plaintiffs' allege that the FirstGroup Defendants failed to conduct such an investigation with regard to selecting or retaining the Hewitt Funds. (*See, e.g.*, *id.* ("The process that led to the selection and retention of Hewitt Funds for the Plan, and the transfer of Plan assets into those funds, was imprudent and tainted by Hewitt's self-interest. [The] FirstGroup [Defendants] failed to properly take account of Hewitt's conflicted role in recommending the Hewitt Funds for the Plan and failed to take proper steps to mitigate such conflict.")).

Specifically, in their Amended Complaint, Plaintiffs allege that the FirstGroup Defendants agreed to replace the Plan's diverse set of well-established, extremely successful existing funds (the Original Funds) with the Hewitt Funds, despite the fact that: (1) the Committee had only heard one presentation at one meeting about the overhaul from one (allegedly) self-interested advisor (*id.* at ¶¶ 68–72; Doc. 37-8 at 3–4); and (2) certain of FirstGroup's own documents (namely, the 2012 IPS) indicated that it was imprudent to use funds without a three-year track record (Doc. 35 at ¶¶ 10–12, 62). Moreover, Plaintiffs allege that the FirstGroup Defendants have continued to retain the Hewitt Funds despite a consistent record of underperformance and significant losses to the Plan. (*See, e.g.*, *id.* at ¶ 77).

Discovery may establish that the FirstGroup Defendants' actions were both appropriate and well-considered. However, when all of the facts alleged in the Amended

18

Complaint are taken as true, and when all reasonable inferences are drawn in Plaintiffs'
favor, a plausible breach of prudence claim arises. Accordingly, dismissal under Rule
12(b)(6) is unwarranted.

>  b. <u>Duty of loyalty</u>

Next, the FirstGroup Defendants argue that Count I fails to plausibly allege a
breach of the duty of loyalty. (Doc. 37-1 at 14, 20–21). Specifically, the FirstGroup
Defendants argue that Plaintiffs have failed to present plausible facts indicating that the
FirstGroup Defendants' investment decision was made for the purpose of benefitting any
entity over the Plan. (*Id.*) The Court disagrees.

When considering whether the duty of loyalty has been breached, the proper
inquiry is whether "the fiduciary's conduct reflects a subordination of beneficiaries' and
participants' interests to those of a third party." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d
286, 298 (5th Cir. 2000). Put differently, the Court must ask whether the facts alleged
plausibly indicate "that [the] fiduciary acted <u>for the purpose of</u> providing benefits to itself
or some third party"—rather than the participants and beneficiaries. *Cassell*, 285 F.
Supp. 3d at 1062 (emphasis in original); *accord Chao v. Hall Holding Co.*, 285 F.3d 415,
426 (6th Cir. 2002) (stating that, to satisfy the duty of loyalty, a plan fiduciary must act
"with an eye single to the interests of the participants and beneficiaries" (citation
omitted)).

Notably, whether a fiduciary has acted disloyally <u>may be inferred from the
circumstances surrounding the fiduciary's conduct</u>. *See, e.g.*, *Fuller v. SunTrust Banks,
Inc.*, No. 1:11-CV-784, 2019 WL 5448206, at *23 (N.D. Ga. Oct. 3, 2019); *Hugler v.*

*Byrnes*, 247 F. Supp. 3d 223, 230 (N.D.N.Y. 2017); *see also Tussey v. ABB, Inc.*, 850

F.3d 951, 957 (8th Cir. 2017) (stating that a fiduciary's actions, "when taken together and

viewed in context, shed light on their motivations").

      Here, Plaintiffs have sufficiently alleged facts from which one could infer that the

FirstGroup Defendants acted for the purpose of providing benefits to Hewitt, at the

expense of the Plan. Specifically, Plaintiffs allege that Hewitt recommended the Hewitt

Funds to its existing clients (including the FirstGroup Defendants), in an effort to

leverage its existing business relationships into investment in those funds, without regard

to the merit of the Hewitt Funds and without giving proper consideration to whether

existing or alternative options were better suited for the plans it advised. (Doc. 35 at

¶ 49). And Plaintiffs further allege that the FirstGroup Defendants' decision to follow

Hewitt's blatantly self-interested recommendation (indeed, becoming the first 401(k) in

the country to do so) and to invest <u>nearly all of the Plan's assets</u> in the new and untested

Hewitt Funds, while leaving no alternative for Plan participants, demonstrates that the

FirstGroup Defendants' investment decision was made with an eye toward benefitting

Hewitt, rather than the Plan. (*Id.* at ¶¶ 47-50).

      As Plaintiffs explain:

> [O]ver 95% of the Plan's assets (over $250 million) were
> invested in Hewitt Funds going forward, and Plan participants
> had no non-Hewitt options in the Plan lineup other than a low-
> yielding capital preservation fund (likely because [Hewitt's]
> lineup of new products did not include a capital preservation
> fund). Moreover, Plan participants were left without any
> passively-managed index fund option whatsoever, as each
> Hewitt Fund is "primarily actively managed."

20

> A prudent fiduciary acting in the best interest of Plan participants would not have engaged in this restructuring of the Plan's investment lineup in favor of Hewitt Funds.  Although this restructuring benefitted Hewitt, it was detrimental to the Plan and its participants.

(*Id*. at ¶¶ 52-53).

In short, Plaintiffs allege that the FirstGroup Defendants' investment decision posed such an obvious risk to the Plan, while imparting such an obvious benefit on Hewitt, that there is no room to interpret the decision as anything short of a breach of the duty of loyalty.  (*See id.*).

The Court finds that these allegations, taken as true, sufficiently state a claim for breach of the duty of loyalty.  Accordingly, dismissal is unwarranted.

### c.  ERISA's safe harbor

Finally, the FirstGroup Defendants argue that ERISA's safe harbor shields them from any Count I-related liability.  (Doc. 37-1 at 14–16).  Specifically, the FirstGroup Defendants argue that ERISA explicitly allows plan fiduciaries to delegate investment authority to an investment manager.  (*See id.*).  The FirstGroup Defendants argue that, once such a delegation has occurred, the plan fiduciaries "[cannot] be liable for the acts or omissions of that investment manager."  (*Id.* at 7; *see also id.* at 15).  And the FirstGroup Defendants contend that, as the allegations in the Amended Complaint unequivocally establish that Hewitt was appointed as the Plan's investment manager, the FirstGroup Defendants, as Plan fiduciaries, cannot be responsible for Hewitt's subsequent actions in overhauling the Plan.  (*See id.* at 15–16; *see also* Doc. 40 at 10).  The Court is not persuaded.

ERISA does allow plan trustees to appoint an investment manager to administer the assets of a plan. 29 U.S.C. § 1102(c)(3). And ERISA's safe harbor does provide that, once an investment manager has been properly appointed, the plan trustees cannot be liable for its acts/omissions. 29 U.S.C. § 1105(d). As stated in § 1105(d)(1):

> (d) Investment managers
>
>> (1) If an investment manager or managers have been appointed under section 1102(c)(3) of this title, then . . . no trustee shall be liable for the acts or omissions of such investment manager or managers, or be under an obligation to invest or otherwise manage any asset of the plan which is subject to the management of such investment manager.

29 U.S.C. § 1105(d)(1).[11]

*However*, the protections afforded by ERISA's safe harbor come with an important caveat. 29 U.S.C. § 1105(d)(2). While § 1105(d) protects plan trustees against liability for *an investment manager's actions*, § 1105(d) does not protect plan trustees against liability for their own actions. *Id.*; *Harris Tr. & Sav. Bank v. Salomon Bros.*, 832 F. Supp. 1169, 1178 (N.D. Ill. 1993). Indeed, § 1105(d) goes on to explicitly state, in § 1105(d)(2), that "[n]othing in this subsection shall relieve any trustee of any liability under this part for any act of such trustee." 29 U.S.C. § 1105(d)(2).

---

[11] Multiple courts have concluded that, in addition to plan trustees, named fiduciaries are entitled to seek protection under § 1105(d). *See, e.g.*, *Perez v. WPN Corp.*, No. 2:14-CV-1494, 2017 WL 2461452, at *11 (W.D. Pa. June 7, 2017). The Court will assume, for the purposes of this Order, that the FirstGroup Defendants are the type of fiduciaries entitled to seek protection under § 1105(d). Neither party has argued otherwise in the motion to dismiss papers submitted to the Court. (*See* Docs. 37-1, 39, 40).

In light of § 1105(d)(2), other courts have indicated that, where a plan fiduciary actively participates in an imprudent investment decision—through, *e.g.*, the authorization, approval, or direction of the same—that plan fiduciary may be liable for the imprudent investment decision, notwithstanding the appointment of an investment manager. *See, e.g.*, *Harris*, 832 F. Supp. at 1178 (noting that a question of fact existed, as to whether a plan fiduciary who had allegedly authorized and approved improper investments could be liable for those improper investments under ERISA, despite the appointment of an investment manager); *accord Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) (indicating that plan trustees, who had allegedly directed an investment manager's improper investments, could "share joint and several liability with [the investment manager]").[12]

Here, Plaintiffs have not alleged that the FirstGroup Defendants decided to appoint Hewitt as the Plan's investment manager, and then Hewitt, of its own accord, decided to overhaul the Plan's investment menu. (*See generally* Doc. 35). Instead, Plaintiffs have alleged that the FirstGroup Defendants ***actively participated*** in the decision to swap the Original Funds for the Hewitt Funds. (*See id.* at Doc. 35 at ¶¶ 68–72). Indeed, based on the Allegations in the Amended Complaint, the FirstGroup Defendants agreed to overhaul the Plan after a May 22, 2013 presentation by Hewitt. (*See id.*; *see also* Doc. 37-8 at 3–4; Doc. 39 at 14). And then, on August 29, 2013, the FirstGroup Defendants

---

[12] *See also Harpster v. AARQUE Mgmt. Corp.*, No. 4:03-CV-1282, 2005 WL 1719120, at *13 (N.D. Ohio July 22, 2005) (noting that ERISA's fiduciary duties "extend to the selection of investment managers for the Plan and the instructions the fiduciaries provide to those managers" (emphasis added)).

doubled down on this agreement, by executing a Letter Amendment that specifically authorized Hewitt to use only Hewitt Funds in the Plan. (Doc. 35-2 at 3 (confirming that Hewitt could carry out its duties by "selecting exclusively from among the [Hewitt] Funds"); *see also* Doc. 35 at ¶ 71).

Taking these well-pled allegations as true, and drawing all reasonable inferences in favor of Plaintiffs, the Court concludes that Plaintiffs have advanced sufficient facts to indicate that the FirstGroup Defendants' ***own actions*** (as opposed to Hewitt's alone) facilitated the Plan's 2013 overhaul. And, as the FirstGroup Defendants' ***own actions*** are at issue here, the Court cannot conclude that ERISA's safe harbor exempts the FirstGroup Defendants from Count I-related liability. *Accord Rogers v. Millan*, No. 89-3707, 1990 WL 61120, at *3 (6th Cir. 1990) (confirming that, "even where an investment manager has been appointed, [the] trustees' fiduciary duties are not abrogated" (citation omitted)).[13]

---

[13] The FirstGroup Defendants raise an additional related argument with regard to Count I. That is, the FirstGroup Defendants argue that Count I should be dismissed insofar as it seeks to hold them liable for Hewitt's alleged misconduct as co-fiduciaries. (Doc. 37-1 at 21–22). The Court finds this argument unpersuasive. Section 1105(a) provides that co-fiduciary liability is appropriate where "[one fiduciary's] failure to comply with section 1104(a)(1) . . . enable[s] [another] fiduciary to commit a breach . . . ." 29 U.S.C. § 1105(a)(2). Here, as set forth in section III.B.1.c, Plaintiffs have plausibly alleged that the FirstGroup Defendants imprudently authorized Hewitt's 2013 overhaul of the Plan, by, *inter alia*, executing the August 29, 2013 Letter Amendment. (*See* Doc. 35 at ¶ 71; Doc. 35-2 at 3). The Court finds Plaintiffs' allegations sufficient to support a co-fiduciary theory of liability. As such, the Court will allow Plaintiffs' co-fiduciary allegations to proceed to discovery. *Accord Lowen*, 829 F.2d at 1220 (indicating that plan trustees may be jointly and severally liable for breaches under § 1105(a), notwithstanding the protections afforded to them by ERISA's safe harbor).

Based upon the foregoing, Plaintiffs have plausibly alleged a breach of the fiduciary duties of prudence and loyalty under 29 U.S.C. § 1104(a)(1)(A)–(B).  (Doc. 35 at ¶¶ 92-104).  And, as such, the Motion to Dismiss is **DENIED** as to Count I.

### 2. *Count II: breach of the duty to follow plan documents under 29 U.S.C. § 1104(a)(1)(D)*

In Count II, Plaintiffs allege that Defendants have breached their duty to follow the Plan's governing documents under 29 U.S.C. § 1104(a)(1)(D).  (*Id.* at ¶¶ 105–111).  More specifically, Plaintiffs allege that, by agreeing to use Hewitt (as investment manager) and its Funds (as plan assets), Defendants violated the 2012 IPS's requirement that all Plan managers/funds have a track record "at least three years long."  (*Id.*; *see also* Doc. 35-1 at 6).

Both Hewitt and the FirstGroup Defendants move to dismiss Count II for failure to state a claim on which relief can be granted.  (Doc. 37-1 at 22–23; Doc. 38 at 1).  Both Hewitt and the FirstGroup Defendants argue that dismissal is warranted because the 2012 IPS was not an "operative" document at the time of the conduct at issue in Count II.  (Doc. 37-1 at 22–23; Doc. 38 at 1).  On careful review, the Court agrees.

Section 1104(a)(1)(D) provides that "a fiduciary shall discharge his duties with respect to a plan . . . in accordance with the documents and instruments ***governing the plan*** insofar as such documents and instruments are consistent with the provisions of this subchapter . . . ."  29 U.S.C. § 1104(a)(1)(D) (emphasis added); *see also Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 561 (6th Cir. 2015); *Czarski v. Bonk*, No. 96-1444, 1997 WL 535773, at *3 (6th Cir. 1997).

According to the allegations in the Amended Complaint, Defendants adopted the 2012 IPS in March 2012. (Doc. 35 at ¶ 62). <u>Then, at a February 2013 Committee meeting, Defendants replaced that investment policy statement with a revised one</u>. (*See id.* at ¶ 67). Indeed, the Committee's February 15, 2013 minutes explicitly provide that the Committee "adopted" a document entitled FirstGroup America, Inc., FirstGroup America 40l (k) Savings Plan, Investment Policy Statement, Revised by Committee action. (*Id.*)

In light of the Committee's February 15, 2013 action, the 2012 IPS was only an operative document "governing the plan" between its adoption in March 2012 and its revision in February 2013. 29 U.S.C. § 1104(a)(1)(D). This is dispositive of Count II, because the conduct at issue in Count II—*i.e.*, the decision to use Hewitt (as investment manager) and its Funds (as Plan assets)—did not occur until <u>after</u> the 2012 IPS had been replaced. (Doc. 35 at ¶¶ 105–111). Indeed, Hewitt did not pitch the 2013 overhaul to the Committee until May 22, 2013, and the 2013 overhaul did not actually take effect until October 1, 2013. (*Id.*)

The Court cannot allow Plaintiffs to maintain a claim for breaches of the 2012 IPS, when, based upon their own allegations, the 2012 IPS was not an operative document at the time of the breaches alleged. Moreover, neither party has submitted the February 2013 revision to the Court for review, and the Court cannot speculate that it contains the same "three or more years" requirement as the 2012 IPS. (Doc. 35-1 at 6; *see also* Doc. 35 at ¶ 67 n.32).

For all these reasons, Count II must be dismissed.  (*Id.*)  However, the Court understands that this case is in its infancy, and that discovery may yet produce evidence supporting a § 1104(a)(1)(D) claim.  Accordingly, the Court will dismiss Count II without prejudice.  Plaintiffs may seek the Court's leave to assert an amended § 1104(a)(1)(D) claim if/when they have a good faith basis to allege that Defendants have breached the terms of a document or instrument governing the Plan at the time of the wrongs asserted.

The Motion to Dismiss is **GRANTED without prejudice** as to Count II.[14]

### 3. *Count III: breach of the duty to monitor Plan fiduciaries under the standards set forth in ERISA*

Finally, in Count III, Plaintiffs allege that FirstGroup has failed to monitor the Plan's other fiduciaries in accordance with the standards set forth in ERISA.  (Doc. 35 at at ¶¶ 112–18).  More specifically, Plaintiffs allege that by failing to closely/diligently oversee the process by which the Hewitt Funds were selected, FirstGroup failed to ensure that Hewitt and the Committee discharged their Plan-related duties prudently and loyally. (*Id.*)

The FirstGroup Defendants move to dismiss Count III for failure to state a claim on which relief can be granted.  (Doc. 37-1 at 24–25).  In their motion to dismiss, the FirstGroup Defendants argue that dismissal is warranted, because "Plaintiffs only make conclusory allegations" regarding FirstGroup's alleged failure to monitor.  (*Id.*)  On

---

[14] Of course, Plaintiffs remain free to argue that the 2012 IPS speaks to the standard of care that a prudent fiduciary would/should have used to select investment funds/managers for the Plan.  (*See* Section III.B.1.a, *supra*).

careful review, the Court disagrees.

The "ERISA statutory scheme imposes a duty to monitor upon fiduciaries when they appoint other persons to make decisions about the plan." *In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 832 (S.D. Ohio 2004). Monitoring should occur "[a]t reasonable intervals" and "in such manner as may be reasonably expected to ensure that [] performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan." 29 C.F.R. § 2509.75–8.

Here, the Amended Complaint alleges that FirstGroup did not live up to its monitoring-related duties, because FirstGroup, *inter alia*: failed to "have a system in place" for evaluating either Hewitt's or the Committee's conduct; ignored the substantial "conflicts of interest" associated with Hewitt's/its Funds' retention by the Plan; granted "Hewitt carte blanche to make self-interested investment recommendations" as to the administration of the Plan; and stood "idly by as the Plan suffered significant losses as a result of imprudent and disloyal actions." (Doc. 35 at ¶ 116).

While Plaintiffs' allegations are not overwhelmingly specific, at this early juncture, Rule 8 does not require a plaintiff to set forth a claim in extraordinary detail. Fed. R. Civ. P. 8(a)(2). Instead, Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* On careful review, the Court concludes that the Amended Complaint meets this preliminary standard. (*See* Doc. 35 at ¶¶ 112–18). And therefore, Count II states a cognizable failure to monitor claim.

Notably, this Court is not alone in reaching such a conclusion. Other courts have allowed plaintiffs' failure to monitor claims to proceed on similar allegations. *See, e.g.*,

*Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. 8:15-CV-1614, 2016 WL 4507117, at
*7 (C.D. Cal. Aug. 5, 2016) (concluding that plaintiffs sufficiently pled a failure to
monitor claim, where plaintiffs alleged, *inter alia*, that defendants had failed to either
"monitor and evaluate the performance of their appointees, or . . . have a system in place
for doing so (emphasis omitted)); *see also In re AEP*, 327 F. Supp. 2d at 832–33.

The Motion to Dismiss is **DENIED** as to Count III.

## IV. CONCLUSION

Based upon the foregoing, Defendants' motions to dismiss (Docs. 37, 38) are
**GRANTED in part** and **DENIED in part** as follows. Count II is **DISMISSED without
prejudice**. In all other respects, the motions to dismiss are **DENIED**.

**IT IS SO ORDERED.**

Date: 3/18/2021

Timothy S. Black
United States District Judge

29