## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| Jeffrey McGinnes, Wendy Berry, Lorri Hulings, and Kathleen Sammons, individually and as representatives of a class of similarly situated persons, and on behalf of the FirstGroup America, Inc. Retirement Savings Plan,<br><br>                          Plaintiffs,<br>v.<br><br>FirstGroup America, Inc., FirstGroup America, Inc. Employee Benefits Committee,  and Aon Hewitt Investment Consulting, Inc.,<br><br>                         Defendants. | Case No. 1:18-cv-00326-TSB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT** |

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs  Jeffrey McGinnes, Wendy Berry, Lorri Hulings, and Kathleen Sammons ("Plaintiffs"), individually and as representatives of the class defined herein, and on behalf of the FirstGroup America, Inc. Retirement Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants FirstGroup America, Inc. (the "Company") and the FirstGroup America, Inc. Employee Benefits Committee (the "Committee") (together, "FirstGroup") and Aon Hewitt Investment Consulting, Inc. ("Hewitt") (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties under ERISA by engaging in a radical redesign of the Plan's investment menu that was designed to benefit Hewitt (the Plan's fiduciary investment consultant) rather than the participants and beneficiaries of the Plan, and have stubbornly adhered

to this imprudent menu design in spite of evidence that it has caused significant and ongoing damage to the Plan.

2.      In summary, Defendants removed a large number of established funds in the Plan that were performing well (at Hewitt's self-interested urging), and replaced them with an unproven set of newly-launched funds from Hewitt that were inappropriate for the Plan and had not been adopted by the fiduciaries of any other retirement plans. In the process, Defendants transferred over a quarter billion dollars in Plan assets (more than 90% of the Plan's total assets) into these new and untested funds, and left participants with no other meaningful investment options. The results have been disastrous. Since these experimental funds were added to the Plan in 2013, they have consistently underperformed their benchmarks, and have underperformed the funds they replaced by tens of millions of dollars. Yet, in spite of this, Defendants have continued to retain these funds, doubling down on their initial imprudent decision and committing further breaches of their ongoing duties to the Plan. *See Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828 (2015) ("[A] trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset."). Plaintiffs bring this action to remedy this unlawful conduct, recover the Plan's losses, disgorge the profits that Hewitt wrongfully received, prevent further mismanagement of the Plan, and obtain other appropriate relief as provided by ERISA and otherwise available at law or in equity.

## PRELIMINARY STATEMENT

3.      As of the end of 2017, Americans had approximately $7.7 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $27.9 Trillion in Fourth Quarter 2017* (Mar. 22, 2018),

*available at* https://www.ici.org/research/stats/retirement/ret_17_q4. These plans are the primary retirement savings vehicle for many Americans, replacing defined benefit plans—commonly referred to as "pension plans"—predominant in previous generations. *See* DEP'T OF LABOR, *Private Pension Plans Bulletin, at 1-3* (Feb. 2018), *available at* https://www.dol.gov/sites/default/files/ebsa/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2015.pdf.

4.     The fiduciary duties of loyalty and prudence imposed by ERISA upon retirement plan fiduciaries are critical to safeguard defined contribution plan participants. These twin fiduciary duties are "the highest known to the law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar character. 29 U.S.C. § 1104(a)(1)(B).

5.     Both FirstGroup and Hewitt were subject to these fiduciary duties. However, they have not lived up to those duties in connection with their recent redesign of the Plan lineup and retention of proprietary funds from Hewitt.

6.     Hewitt has acted as the investment consultant to the Plan since at least 2009. As a consultant to the Plan, Hewitt provided analysis and advice to FirstGroup regarding which investments to include in the Plan's investment menu. In performing that function, Hewitt was obligated to provide investment analysis and make investment recommendations to the Plan with an "eye single" to the interests of Plan participants, "exclud[ing] all selfish interest," *Pegram v. Hedrich*, 530 U.S. 211, 224, 235 (2000), and exercise the high standard of care that applies to

fiduciaries under ERISA. Indeed, Hewitt specifically markets itself as providing "independent" and objective investment advice.[1]

7.      When Hewitt initially consulted with FirstGroup, it appears that Hewitt attempted to provide independent advice to the Plan, and helped FirstGroup construct and maintain an investment lineup for the Plan consisting of a diverse set of investment products from a number of different fund managers. This changed, however, when Hewitt started a new business venture and began offering its own line of investment products (referred to herein as the "Hewitt Funds"), which it introduced to the 401(k) plan marketplace on or about September 30, 2013.

8.      In connection with the launch of the Hewitt Funds, Hewitt attempted to leverage its existing consulting client base to attract investors. The overwhelming majority of 401(k) plan sponsors that it advised did not fall for the sales pitch, and rejected the Hewitt Funds for their plans through their own fiduciary screening process. However, FirstGroup was not as discerning. Immediately after the Hewitt Funds were launched, FirstGroup became the first employer in the country to include them in its 401(k) Plan, and even went so far as to make the Hewitt target-date fund series the Plan's default investment option. At the same time, almost all of the Plan's existing investment options were eliminated, and more than 90% of the Plan's investable assets (more than $250 million)[2] were transferred to Hewitt Funds in the process.

9.      This radical makeover was unnecessary, imprudent, and not in the best interest of Plan participants. Each of the existing funds in the Plan were managed by experienced asset

---

[1]  *See, e.g.,* http://www.aon.com/human-capital-consulting/retirement/investment-consulting/ ("We provide independent advice"); http://www.aon.com/human-capital-consulting/retirement/investment-consulting/core-services/manager-evaluation-search.jsp ("We provide ourselves on our independence and objectivity").
[2] Investable assets of the Plan include all reported assets other than participant loan balances.

managers, had established, GIPS-compliant track records, and had met or exceeded their benchmark indices over the long-term. Hewitt only advised FirstGroup to replace the existing funds with Hewitt Funds because Hewitt needed to attract capital for the Hewitt Funds for its own business reasons. This advice was tainted by Hewitt's self-interest, and FirstGroup should have recognized this conflict of interest, independently scrutinized the Hewitt Funds, and rejected them for the Plan.

10.     Even if certain changes to the Plan had been warranted, it was not prudent or in the best interests of Plan participants to include Hewitt's experimental funds in the Plan and invest almost all of the Plan's assets in those funds. As a general rule, fiduciaries of other retirement plans generally require a performance history of three or more years before considering an investment for a retirement plan.[3]

11.     Indeed, the change specifically violated the Plan's Investment Policy Statement (IPS). *See* Exhibit A, IPS § IV (entitled "Selection and Retention Criteria for Investment Managers or Funds").[4] The IPS required investment funds and managers to have a track record "at least three years long" that could be "measured on a reasonable basis (not back-tested or theoretical …)". *See id.* The IPS further required a manager to have "a reasonable client base in this investment style". *See id.* FirstGroup's selection of Hewitt and the Hewitt Funds violated these and other provisions of the IPS. *See infra*, at Paragraphs 62-70.

12.     The performance of the Hewitt Funds since their inception illustrates why prudent fiduciaries take a "wait and see" approach before recommending newly-launched funds for a

---

[3] *See* Expert Report of Marcia Wagner, *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. 8:15-cv-01614 (C.D. Cal.), Dkt. No. 160-9.
[4] Exhibit A was produced to Plaintiffs by FirstGroup in this litigation. The Committee adopted this revised IPS at its meeting of February 15, 2013.

retirement plan, and why the Plan's IPS prohibited the selection of investment managers and funds without an established track record of at least three years. From the time they were launched on September 30, 2013, the Hewitt Funds have underperformed both their stated benchmarks and the established funds that Hewitt eliminated from the Plan. Yet, Defendants have stubbornly continued to retain the Hewitt Funds in the Plan, in breach of their ongoing duty to monitor the Plan's investments and remove imprudent ones.

13.     Plan participants have suffered tens of millions of dollars in investment losses as a result of Defendants' selection and retention of the Hewitt Funds, and transfer of Plan assets into those funds. Plaintiffs bring this action to recover these losses to the Plan, disgorge the profits that Hewitt received, prevent further mismanagement of the Plan, and obtain other appropriate relief available under ERISA.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

15.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where FirstGroup may be found.

## THE PARTIES

### *Plaintiffs*

16.     Plaintiff Jeffrey McGinnes resides in Wilmington, Delaware, and was a participant in the Plan in 2015 and 2016. Plaintiff McGinnes was invested in the Aon Hewitt 2030 Retirement Solution Fund through his account in the Plan. Through this fund, which is comprised of other Hewitt Funds, Plaintiff McGinnes is also invested in the Aon Hewitt Large Cap Equity Fund, Aon

Hewitt Small & Mid Cap Equity Fund, Aon Hewitt Global Equity Fund, Aon Hewitt Non-U.S. Equity Fund, Aon Hewitt High Yield Plus Fund, Aon Hewitt Growth Fund, Aon Hewitt Income Fund, Aon Hewitt Inflation Fund, Aon Hewitt Core Plus Bond Fund, and Aon Hewitt Global Real Estate Fund. Plaintiff McGinnes' account suffered losses as a result of Defendants' fiduciary breaches, and would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein. Further, Hewitt has been unjustly enriched as a result of Plaintiff McGinnes' investment in the Aon Hewitt 2030 Retirement Solution Fund.

17.    Plaintiff Wendy Berry resides in Burton, Michigan, is a current participant in the Plan, and has been a participant in the Plan since 2015. Plaintiff Berry is invested in the Aon Hewitt 2035 Retirement Solution Fund through her account in the Plan. Through this fund, which is comprised of other Hewitt Funds, Plaintiff Berry is also invested in the Aon Hewitt Large Cap Equity Fund, Aon Hewitt Small & Mid Cap Equity Fund, Aon Hewitt Global Equity Fund, Aon Hewitt Non-U.S. Equity Fund, Aon Hewitt High Yield Plus Fund, Aon Hewitt Growth Fund, Aon Hewitt Income Fund, Aon Hewitt Inflation Fund, Aon Hewitt Core Plus Bond Fund, and Aon Hewitt Global Real Estate Fund. Plaintiff Berry's account suffered losses as a result of Defendants' fiduciary breaches, and would be worth more if Defendants had not violated ERISA as described herein. Further, Hewitt has been unjustly enriched as a result of Plaintiff Berry's investment in the Aon Hewitt 2035 Retirement Solution Fund.

18.    Plaintiff Lorri Hulings resides in Erie, Pennsylvania, is a current participant in the Plan, and was a participant in the Plan at all times during the putative class period. Plaintiff Hulings is invested in the Aon Hewitt 2025 Retirement Solution Fund through her account in the Plan. Through this fund, which is comprised of other Hewitt Funds, Plaintiff Hulings is also invested in the Aon Hewitt Large Cap Equity Fund, Aon Hewitt Small & Mid Cap Equity Fund, Aon Hewitt

Global Equity Fund, Aon Hewitt Non-U.S. Equity Fund, Aon Hewitt High Yield Plus Fund, Aon Hewitt Growth Fund, Aon Hewitt Income Fund, Aon Hewitt Inflation Strategy Fund, and Aon Hewitt Core Plus Bond Fund. Plaintiff Hulings' account suffered losses as a result of Defendants' fiduciary breaches, and would be worth more if Defendants had not violated ERISA as described herein. Further, Hewitt has been unjustly enriched as a result of Plaintiff Hulings' investment in the Aon Hewitt 2025 Retirement Solution Fund.

19.     Plaintiff Kathleen Sammons resides in Arlington Heights, Illinois, is a current participant in the Plan, and was a participant in the Plan at all times during the putative class period. Plaintiff Sammons is invested in the Aon Hewitt 2025 Retirement Solution Fund through her account in the Plan. Through this fund, which is comprised of other Hewitt Funds, Plaintiff Sammons is also invested in the Aon Hewitt Large Cap Equity Fund, Aon Hewitt Small & Mid Cap Equity Fund, Aon Hewitt Global Equity Fund, Aon Hewitt Non-U.S. Equity Fund, Aon Hewitt High Yield Plus Fund, Aon Hewitt Growth Fund, Aon Hewitt Income Fund, Aon Hewitt Inflation Strategy Fund, and Aon Hewitt Core Plus Bond Fund. Plaintiff Sammons' account suffered losses as a result of Defendants' fiduciary breaches, and would be worth more if Defendants had not violated ERISA as described herein. Further, Hewitt has been unjustly enriched as a result of Plaintiff Sammons' investment in the Aon Hewitt 2025 Retirement Solution Fund.

### *Defendants*

20.     Defendant FirstGroup America, Inc. (the "Company") is a transportation services company headquartered in Cincinnati, Ohio. The Company is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). The Company is also the "administrator" of the Plan within the meaning of 29 U.S.C. § 1002(16)(A), and is a "named fiduciary" within the plan documents,

making the Company a fiduciary pursuant to 29 U.S.C. § 1102(a)(2). As the Plan sponsor, administrator, and as a named fiduciary, the Company exercises discretionary authority or discretionary control with respect to the administration of the Plan and management and disposition of Plan assets. The Company is therefore also a fiduciary under 29 U.S.C. § 1002(21)(A).

21. The Company delegated certain investment and other duties with respect to the Plan to Defendant FirstGroup America Inc. Employee Benefits Committee (the "Committee").[5] The Committee consists of officers of the Company appointed by the Company through its Board of Directors. The Committee members may only be removed by action of the Board. The Committee has the power and responsibility to select, appoint, monitor, and remove investments, investment managers, and investment consultants on behalf of the Plan. The Committee also must report on its actions to the Board at least once per year. Based on its duties delegated by the Company, the Committee is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A). Pursuant to this delegation and other rules of the Plan, the Company has a fiduciary duty to monitor the performance of the Committee.

22. Defendant Hewitt is a registered investment adviser headquartered in Chicago, Illinois. Hewitt was formerly known as Hewitt EnnisKnupp, Inc., and is the successor by merger to Ennis Knupp & Associates, Inc., Hewitt Investment Group LLC, and Aon Investment Consulting Inc. Hewitt provided investment advisory services to the Plan dating back to at least 2009, and continues to provide investment advisory services to the Plan, relating to the selection and monitoring of the Plan's investment options, and the removal, replacement, and retention of

---

[5] The Committee is the successor to several predecessor committees that were merged into the Committee by resolution of the Board of Directors of the Company in July 2012.

those investment options (subject to the ultimate discretion and approval of FirstGroup). As the Plan's investment consultant, Hewitt rendered advice to the Plan on a regular basis in exchange for consulting fees, pursuant to a mutual agreement acknowledging that Hewitt would provide individualized advice to the Plan regarding investment policies and strategy along with portfolio composition that would serve as the primary basis for investment decisions with respect to Plan assets. Hewitt also received investment management fees and/or other fees in connection with the Plan's investment in the Hewitt Funds. Hewitt is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A) because Hewitt exercised discretionary authority or control respecting disposition of Plan assets and rendered investment advice for a fee or other compensation, direct or indirect, with respect to Plan assets.

23. Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## THE PLAN

24. The Plan was established by the Company and went into effect on January 1, 2009. The Plan is the successor to several plans established by the Company and other transportation services companies acquired by FirstGroup America, Inc., including Laidlaw, Greyhound Lines, and others. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

25.     The Plan covers eligible current and former employees of FirstGroup America, Inc. and related companies. Eligible employees saving for retirement may contribute a percentage of their earnings on a pre-tax basis to the Plan. Employees also may receive tax-deferred contributions from their employer.  Prior to September 30, 2013, the Plan offered 11 investment options to participants. These options included a "target date" option managed by T. Rowe Price, in which participants could invest in a fund that would change its composition as  participants approached their anticipated retirement date; a stable value fund managed by Wells Fargo, designed to provide protection of principal; a passive index fund option designed to mirror the performance of the S&P 500 index; and eight actively-managed mutual funds managed by experienced managers, including American Funds, Dodge & Cox, and others, which provided exposure to particular asset classes and sub-asset classes.

26.     On October 1, 2013, the Plan's investment lineup underwent significant revision. All funds except the stable value fund were removed from the menu. The Plan now offers six new menu options, plus a self-directed brokerage account (SDBA). The new options are all managed by Hewitt. The T. Rowe Price target date series was replaced with the Aon Hewitt Retirement Solution target date series, and the eight funds providing asset class exposure were replaced with the Aon Hewitt Large Cap Equity Fund, Aon Hewitt Non-U.S. Equity Fund, Aon Hewitt Small & Mid Cap Equity Fund, Aon Hewitt Core Plus Bond Fund, and Aon Hewitt Inflation Strategy Fund. After the change, the Plan's menu no longer includes a solely passive option.

## ERISA FIDUCIARY DUTIES

27.     ERISA recognizes "that the continued well-being and security of millions of employees and their dependents are directly affected by [retirement] plans." 29 U.S.C. § 1001(a).

Thus, "[t]he principal object of the statute is to protect plan participants and beneficiaries." *Boggs v. Boggs*, 520 U.S. 833, 845 (1997) (citation omitted). The "crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators" and "ERISA was designed to prevent these abuses." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985) (citing extensive legislative history).

28.    To protect plan participants, ERISA incorporates the twin fiduciary duties of loyalty and prudence. *See* 29 U.S.C. § 1104(a)(1). These fiduciary duties are the "highest known to law." *Hall Holding Co.,* 285 F.3d 415, 426 (6th Cir. 2002) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

### *Duty of Loyalty*

29.    The duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with "an eye single" to the interests of plan participants. *Pegram*, 530 U.S. at 235; *see also Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 597 (6th Cir. 2012) (duty of loyalty requires "single-minded devotion to the plan participants and beneficiaries"), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014). "A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988).

30.    A plan fiduciary cannot, consistent with the duty of loyalty, take into account its own business interests when making investment or administrative decisions concerning the plan. "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an

absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

### Duty of Prudence

31.     The duty of prudence requires fiduciaries to exercise the "care, skill, prudence, and diligence" that a prudent person would utilize in managing a similar plan." 29 U.S.C. § 1104(a)(1)(B). This is not a lay person standard, but instead "requires expertise in a variety of areas, such as investments." Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (Sept. 2017), at 2, *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

32.     The duty of prudence applies to the initial selection of a plan's investment options, and also entails a "continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

33.     When deciding whether to select, retain, or remove a plan investment option, the duty of prudence requires that fiduciaries conduct an "appropriate investigation into the merits of the investment at issue, and take action when prudence so dictates." *In re Ford Motor Co. ERISA Litig.*, 590 F. Supp.2d 883, 908 n.11 (E.D. Mich. 2008); *see also Chao*, 285 F.3d at 426.

34.     Although a retirement plan sponsor and fiduciary committee (such as the Company and the Committee) may seek input from an investment consultant (such as Hewitt) with regard to the plan's investment options, this does not absolve the sponsor and committee of their fiduciary duties. In such a case, the sponsor, committee, and the consultant share these fiduciaries duties with respect to the Plan under 29 U.S.C. § 1104(a).

### THE DEFINED CONTRIBUTION PLAN INVESMENT MENU

35.     In a defined contribution plan, fiduciaries are obligated to assemble a diversified menu of investment options for participants. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). These options are known as "designated investment alternatives."[6] A fiduciary must comply with ERISA's duties of prudence and loyalty in the selection and monitoring of the designated investment alternatives on the plan menu.  *See* 29 C.F.R. § 2550.404c-1(d)(2)(iv).

36.     Each designated investment alternative is generally a pooled investment vehicle— which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class, or a mix of asset classes. INVESTMENT COMPANY INSTITUTE, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans*, at 8 (Mar. 2018), *available at* www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf ("2018 ICI Study"); Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) ("*Beyond Diversification*").

37.     Every pooled investment product charges certain fees and expenses that are paid by deductions from the pool of assets in transactions that typically occur on a monthly or quarterly basis.

38.     The broad asset classes generally include fixed investments, bonds, stocks, real estate, and commodities. Stable value funds, guaranteed investment contracts, and money market funds are examples of fixed investments. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and

---

[6] A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants . . . may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4).

the default risk associated with the particular borrower. Equity (or "stock") investments obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company.

39.     Equity investments are generally defined by three characteristics: (1) where the investment managers invest geographically (*i.e.*, whether they invest in domestic or international companies, or both); (2) the size of companies they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, *i.e.* growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds invest in a mix of growth stocks,  value stocks, and companies in between).

40.     Balanced funds are a type of fund that invests in a mix of asset classes. Target date funds represent a particular type of balanced fund. A target date fund is a diversified investment fund that provides exposure to a variety of asset classes, comprised mostly of equity and fixed income securities, with an investment mix that changes to become more conservative as the fund's target (retirement) date approaches. Target date funds are generally offered as a suite of funds with target dates staggered 5 to 10 years apart, allowing the participant to choose the target date that aligns with his or her estimated retirement date. Target date funds typically use a "fund of funds" structure, meaning that each fund invests in other pooled invested vehicles in proportions determined by the manager of the funds.

41.     Target date funds are associated with the "set it and forget it" approach to investing by retirement plan participants. Participants investing a portion of their account in a target date fund typically do not expect to change their selection over time. Instead, participants rely on the

manager-driven rebalancing of the fund to implement a sound investment strategy for their account over their retirement saving horizon.

42.     All options can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of market indices, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively-managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically more expensive than index funds, but offer the potential to outperform the market. DEP'T OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

43.     In addition to the designated investment alternatives, many plans (including the Plan at issue here) provide employees the option of opening a self-directed brokerage account ("SDBA"), giving them access to an array of thousands of additional stocks, bonds, and mutual funds. *Beyond Diversification* at 1524. However, SDBAs have significant drawbacks and are used by only a small percentage of retirement plan participants.[7] The existence of an SDBA option does

---

[7] Assets held in SDBAs account for only 1.07% of Plan assets, according to the Plan's most recent Form 5500 filing, consistent with national rates. *See* INVESTMENT COMPANY INSTITUTE & DELOITTE CONSULTING LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees*, at 15 (Aug. 2014), *available at* https://www.ici.org/pdf/rpt_14_dc_401k_ fee_study.pdf (SDBAs represent less than 2% of retirement plan assets). Participants that choose to utilize an SDBA are typically assessed an account fee, a fee for each trade, and additional fees associated with servicing

not excuse plan fiduciaries from constructing and maintaining a prudent and appropriate menu of designated investment alternatives. *See Wildman v. Am. Century Services, LLC*, 237 F. Supp. 3d 902, 913 (W.D. Mo. 2017) ("The existence of the [SDBA] option is irrelevant to determining whether Defendants used a disloyal and imprudent process to select the other investment options.").

44.     Selecting and retaining inferior investment options because those selections benefit a party in interest constitutes a breach of fiduciary duty. *See Tussey v. ABB, Inc.*, 850 F.3d 951, 956 (8th Cir. 2017) (upholding district court's finding that replacement of funds "was motivated in large part to benefit [the service provider and sponsor], not the Plan participants", and therefore constituted a breach of fiduciary duty), *cert. denied*, 138 S. Ct. 281 (2017); *see also Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009) ("The complaint alleges … that these options were chosen to benefit the trustee at the expense of the participants. If these allegations are substantiated, the process by which appellees selected and managed the funds in the Plan would have been tainted by failure of effort, competence, or loyalty.").

45.     For an employer fiduciary like FirstGroup America, Inc., failing to protect plan participants from a self-interested service provider constitutes a breach of fiduciary duty. *See*

---

each investment option—which would not be charged in connection with investments included among a plan's designated investment alternatives. *See* DEP'T OF LABOR, *Field Assistance Bulletin 2012-02R* (July 30, 2012), *available at* https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2012-02r; *see also* 29 C.F.R. § 2550.404a-5(h)(4) (excluding SDBA investments from the definition of "designated investment alternative"). The Plan's SDBA option is subject to such additional fees. Fiduciaries are also under no obligation to disclose performance, benchmark, or fee information regarding the investments available within an SDBA. *See id.* § 2550.404a-5(d). Participants typically fare worse utilizing SDBA accounts that sticking to the designated investment alternatives. *See* Dr. Gregory Kasten, *Self-Directed Brokerage Accounts Reduce Success*, at 1, 13–14 (2004), *available at* http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (self-directed brokerage accounts lagged the performance of a model portfolio of the plan's designated investment alternatives by significant margin).

*Terraza v. Safeway*, 241 F. Supp. 1057, 1071 (N.D. Cal. 2017) ("These allegations plausibly suggest that the [employer fiduciaries] breached their duty of loyalty by allowing the Plan's trustee to make Plan-related decisions that were not in the best interest of Plan participants.").

## DEFENDANTS' VIOLATIONS OF ERISA

### I.    HEWITT'S DEVELOPMENT AND SELF-SERVING PROMOTION OF ITS OWN FUNDS

46.    In 2011, Hewitt became the largest investment consultant in the world.[8] As an investment consultant, Hewitt provides advice regarding, among other things, "investment lineup analysis, investment policy development, manager searches, and ongoing performance reporting and evaluation."[9]

47.    Hewitt owes its large market share to the 2010 merger of three previously unaffiliated firms: EnnisKnupp, Hewitt Associates, and Aon Investment Consulting.[10] At the time of the merger, industry observers and plan sponsors questioned whether the combined firm could deliver the same independent, unbiased investment advice associated with its predecessor firms.[11] As the facts of this case demonstrate, these concerns turned out to be prescient.

---

[8] Tim Jenkinson, et al., *Picking Winners? Investment Consultants' Recommendations of Fund Managers*, 71 J. Fin. 2333, 2334 (Oct. 2016) ("*Picking Winners*") (citing PENSIONS & INVESTMENTS, *Consultants Directory 2011* (Nov. 28, 2011), *available at* http://researchcenter.pionline.com/rankings/consultant/specialreports/aua?year=2011.

[9] http://www.aon.com/human-capital-consulting/retirement/investment-consulting/about-us/our-clients/defined-contribution-plans.jsp.

[10] *See* PENSIONS & INVESTMENTS, *Consultants Directory 2009* (Nov. 30, 2009), *available at* http://researchcenter.pionline.com/rankings/consultant/specialreports/aua?year=2009.

[11] *See* William P. Barrett, *Is "Conflict-Free" EnnisKnupp Selling Its Soul*, FORBES (Aug. 23, 2010), *available at* https://www.forbes.com/2010/08/23/ennisknupp-aon-hewitt-pension-consultant-personal-finance-conflict-of-interest.html#58b01f001160; William P. Barrett, *EnnisKupp Drinks the Kool-Aid*, Forbes (Sept. 2, 2010), *available at* https://www.forbes.com/sites/williampbarrett/2010/09/02/ennisknupp-ends-decades-of-conflict-free-pension-advice/#45bc59b56d0e ("*Drinks the Kool-Aid*"); Douglas Appell, *Hewitt EnnisKnupp still suffers merger pains*, Pensions & Investments (Apr. 2, 2012), *available at*

48.     Following the merger, Hewitt aggressively pursued new product development, in an effort to expand its business. Among the products that Hewitt developed was a set of proprietary collective investment trusts that were marketed to defined contribution plans. These proprietary funds were an entirely new venture for Hewitt, as it had never previously developed its own set of funds for defined contribution plans and historically had limited its role to advising clients regarding funds offered by other companies.

49.     Although Hewitt continues to market itself as an honest broker that provides "independent" and objective advice to its consulting clients, *see supra* at ¶ 6 & n.1, it has allowed its own self-interest to seep into that advice.  Specifically, Hewitt has recommended the Hewitt Funds to its consulting clients, in an effort to leverage its existing business relationships and attract investment in those funds, without regard to the merit of the Hewitt Funds and without giving proper consideration to whether existing or alternative options are better suited for the plans it advises.

50.     Hewitt made a similar recommendation to FirstGroup. As an investment consultant to the Plan, Hewitt regularly consulted with FirstGroup regarding the investment options in the Plan. Upon launch of the Hewitt Funds on September 30, 2013, the Plan's investment options were substantially overhauled on October 1, 2013.[12] As part of this overhaul, several Hewitt Funds were added to the Plan, and the Aon Hewitt Retirement Solution target date series was designated as the Plan's default investment option. In the process, over $250 million in Plan assets was transferred

---

http://www.pionline.com/article/20120402/PRINT/304029984/hewitt-ennisknupp-still-suffers-merger-pains ("*Merger Pains*").

[12] Prior to developing its own funds, Hewitt did not recommend a comprehensive overhaul of the Plan's investment options. Several changes were made under Hewitt's direction, but the lineup remained relatively stable year-to-year. *See* Plan Form 5500s, Schs. C, 2009-2012.

into Hewitt Funds. The FirstGroup Plan was the first 401(k) plan in the country to invest in Hewitt Funds, and very few plan sponsors have adopted Hewitt Funds since then. Those that have done so were also Hewitt clients.

## II. DEFENDANTS' IMPRUDENT ADOPTION OF HEWITT'S EXPERIMENTAL FUNDS AND TRANSFER OF OVER $250 MILLION IN PLAN ASSETS INTO THOSE FUNDS

51.     The Hewitt Funds did not simply supplement the Plan's existing investment options. When the Hewitt Funds were added to the Plan, all of the Plan's existing investment options (with the exception of the Plan's capital preservation option) were removed. The following illustration compares the Plan's investment lineup before and after this realignment:

*Illustration 1: Plan Investment Lineup Before and After Overhaul with Hewitt Funds*

| Before | After |
|---|---|
| **Target Date Funds** | **Target Date Funds** |
| - T. Rowe Price Retirement Series | - Aon Hewitt Retirement Series |
| **Actively-Managed Funds** | **Actively-Managed Funds** |
| - Wells Fargo Advantage Small Cap Value Fund | - Aon Hewitt Core Plus Bond Fund |
| - American Funds EuroPacific Growth Fund | - Aon Hewitt Inflation Strategy Fund |
| - Artisan Mid Cap Value Fund | - Aon Hewitt Large Cap Equity Fund |
| - Baron Growth Fund | - Aon Hewitt Non-U.S. Equity Fund |
| - Dodge & Cox Stock Fund | - Aon Hewitt Small & Mid Cap Equity Fund |
| - Mainstay Large Cap Growth Fund | **Passively-Managed Funds** |
| - Morgan Stanley Mid Cap Growth Portfolio | - None |
| - PIMCO Total Return Fund | **Capital Preservation Option** |
| **Passively-Managed Funds** | - Wells Fargo Stable Return Fund |
| - Wells Fargo S&P 500 Index Fund | |
| **Capital Preservation Option** | |
| - Wells Fargo Stable Return Fund | |

52.     At the same time, Defendants also made the Aon Hewitt Retirement Series the Plan's default investment option.[13] The end result of these changes was that over 95% of the Plan's assets (over $250 million) were invested in Hewitt Funds going forward, and Plan participants had

---

[13] The Wells Fargo Stable Return Fund was previously designated as the Plan's default investment option. Plaintiffs do not challenge the selection of a target date series as the Plan's default option, but do challenge Defendants' decision to replace T. Rowe Price's target-date series with Hewitt's newly launched target-date funds.

no non-Hewitt options in the Plan lineup other than a low-yielding capital preservation fund (likely because Aon Hewitt's lineup of new products did not include a capital preservation fund). Moreover, Plan participants were left without any passively-managed index fund option whatsoever, as each Hewitt Fund is "primarily actively managed."[14]

53.     A prudent fiduciary acting in the best interest of Plan participants would not have engaged in this restructuring of the Plan's investment lineup in favor of Hewitt Funds.   Although this restructuring benefitted Hewitt, it was detrimental to the Plan and its participants.

### The Removed Funds

54.     The funds that Defendants replaced (the "Removed Funds") were well-established investments managed by experienced investment managers. Together, they constituted a diversified set of investment options that allowed participants to choose between large cap, mid cap, small cap, and international stocks, while further offering "growth" and "value" style options within certain asset classes. This allowed participants to customize their asset allocation and risk profile depending upon their investment timeframe, financial goals, risk tolerance, and individualized assessment of which asset classes and investment styles offered them the best potential for investment success. Alternatively, the T. Rowe Price target date series allowed participants to leave these decisions to an experienced investment manager, who would maintain an appropriate portfolio for them based on their expected year of retirement.[15]

---

[14] Form ADV, Part 2A Firm Brochure, Hewitt EnnisKnupp, Inc., at 17 (Mar. 31, 2014), *available at* http://www.aon.com/human-capital-consulting/retirement/investment-consulting/bin/pdfs/AHIC_ADV.pdf.

[15] T. Rowe Price was consistently ranked third among all target date managers by assets managed. ALLIANCEBERNSTEIN & BRIGHTSCOPE, *The Shift from Recordkeeper Proprietary Target-Date Funds to Nonproprietary Solutions*, at 3 (2017), *available at* https://www.alliancebernstein.com/sites/investments/us/resources/pdf/final_dci-7572-0717.pdf.

55. Each of the Removed Funds had a strong, GIPS compliant,[16] long-term record of performance at the time they were replaced. The performance of these funds in relation to their benchmarks as of September 30, 2013 (or the next closest reported date) is shown below:

*Illustration 2: Active Asset Class Funds, 10-Year Returns Prior to Replacement*

|  | 10-year Avg. Annual Return, +/- Benchmark |
|---|---|
| Wells Fargo Advantage Small Cap Value Fund[17] | + 1.45% |
| American Funds EuroPacific Growth Fund[18] | + 0.80% |
| Artisan Mid Cap Value Fund[19] | + 1.92% |
| Baron Growth Fund[20] | + 0.86% |
| Dodge & Cox Stock Fund[21] | + 0.54% |
| Mainstay Large Cap Growth Fund[22] | + 1.68% |
| Morgan Stanley Mid Cap Growth Portfolio[23] | + 2.12% |
| PIMCO Total Return Fund[24] | + 1.53% |

56. The Plan's target date option managed by T. Rowe Price also demonstrated long-term success. All 12 funds in the T. Rowe Price target date series outperformed their benchmarks over the 10-year period prior to replacement (or since the inception of the fund, in the case of funds

---

[16] The Global Investment Performance Standards (GIPS) are a well-recognized and respected series of performance tracking and reporting standards designed to ensure fair and accurate representation of historical investment performance by asset managers that has been verified by a third party. Investopedia, *A Guide to Global Investment Performance Standards*, available at https://www.investopedia.com/articles/07/gips.asp (last accessed Apr. 26, 2018). A prudent fiduciary generally would not rely upon an investment manager's self-reported performance history if it was not GIPS compliant.

[17] https://www.sec.gov/Archives/edgar/data/1081400/000119312513487290/d634022dncsr.htm (reported as of Oct. 31, 2013).

[18] https://www.sec.gov/Archives/edgar/data/719603/000005193113001199/eupac_ncsr.htm (reported as of Sept. 30, 2013).

[19] https://www.sec.gov/Archives/edgar/data/935015/000119312513463408/d615548dncsr.htm#tx615548_10 (reported as of Sept. 30, 2013).

[20] https://www.sec.gov/Archives/edgar/data/810902/000120928613000522/e92540a.htm (reported as of Sept. 30, 2013).

[21] https://www.sec.gov/Archives/edgar/data/29440/000119312514072484/d647384dncsr.htm (reported as of Dec. 31, 2013).

[22] https://www.sec.gov/Archives/edgar/data/787441/000119312514005266/d642478dncsr.htm (reported as of Oct. 31, 2013).

[23] https://www.sec.gov/Archives/edgar/data/741375/000110465913089064/a13-20348_1ncsr.htm (reported as of Sept. 30, 2013).

[24] https://www.sec.gov/Archives/edgar/data/810893/000119312513461838/d598247dncsrs.htm (reported as of Sept. 30, 2013).

in the series that were launched after the fourth quarter of 2003).[25]

### The Hewitt Funds

57.     In contrast to the strong long-term performance of the Plan's existing fund offerings, the Hewitt Funds had no track record at all, and Hewitt did not have experience managing investment products for defined contribution plans. This alone should have disqualified the Hewitt Funds from consideration for the Plan, as fiduciaries of other retirement plans generally require a performance history of three or more years before considering an investment for a retirement plan.[26] For this reason, newly-launched funds are "generally imprudent investment choices for a retirement plan."[27]

58.     Further, substitution of the Hewitt Funds for the Removed Funds took away participants' ability to choose passive investments, and gave them less control over their asset allocation and risk level.

59.     The fact that Hewitt Funds were not prevalent in other retirement plans should have been another red flag. The FirstGroup 401(k) Plan was the first retirement plan in the country to adopt any of the Hewitt Funds. At the time these funds were added to the Plan in 2013, they were not found in a single retirement plan out of more than 648,000 total plans. Thus, Defendants' adoption of these funds was not only inconsistent with the standard of care, it was unprecedented.

---

[25]https://www.sec.gov/Archives/edgar/data/1177017/000120677414000223/srrpi_ncsrs.htm (reported as of Nov. 30, 2013).
[26] *See* Expert Report of Marcia Wagner, *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. 8:15-cv-01614 (C.D. Cal.), Dkt. No. 160-9.
[27] *Id.*

60.     Under the circumstances, a prudent fiduciary would not have included Hewitt Funds in the Plan.  Yet, instead of avoiding these funds, Defendants made them the centerpiece of the Plan by:

(a) designating the Hewitt target date series the Plan's default investment option;

(b) eliminating all but one of the Plan's existing investment options, so as to leave Plan participants with no meaningful alternatives to the Hewitt Funds in the Plan lineup; and

(c) investing more than 95% of the Plan's assets (over $250 million) in Hewitt Funds.

These additional measures were not only imprudent, but reckless.

61.     Based on these facts, it is reasonable to infer that the process that led to the selection of Hewitt Funds for the Plan, and the investment of more than $250 million in Plan assets in those funds, was imprudent and tainted by Hewitt's self-interest.[28] FirstGroup should have recognized that Hewitt had a conflict of interest in recommending its own funds for the Plan, vigorously scrutinized the Hewitt Funds, and declined to adopt the Hewitt Funds or facilitate the transfer of Plan assets into those funds. Both Hewitt and FirstGroup are jointly responsible for the selection of the Hewitt Funds, and breached their fiduciary duties by including those funds in the Plan and causing the Plan to take such a significant stake in in those funds.

---

[28] The investment options that Defendants did _not_ replace further demonstrate that the Plan redesign was driven by Hewitt's self-interest rather than an objective analysis of the investments in the Plan. Defendants retained the Plan's capital preservation option (the Wells Fargo Stable Return Fund), and removed but did not replace the Plan's sole passively-managed option (the Wells Fargo S&P 500 Index Fund).  In each case, Hewitt did not offer a proprietary alternative.

### III.    DEFENDANTS' VIOLATIONS OF THE INVESTMENT POLICY STATEMENT

62.    FirstGroup adopted the operative IPS for the Plan in February 2013, with assistance from Hewitt. Section IV of the IPS is titled "Selection and Retention Criteria for Investment Managers or Funds" and states that "[i]nvestment managers or funds *shall* be chosen and evaluated" using specified criteria. *See* Exhibit A. The first requirement states:

- Performance Record – Historical performance results will be compared against a backdrop of an applicable peer group and appropriate market index benchmarks.  The manager or fund should have a performance record that suggests results that will meet the Plan's investment goals, including a record that is:
  - ➤ at least 3 years long, with longer records of five to seven years being materially important,
  - ➤ measured on a reasonable basis (not back-tested or theoretical, and no apparent anomaly responsible for strong performance, such as extreme variations in returns from year to year),
  - ➤ above the median of an applicable peer group (except for bond funds, that must be in the top quartile) over the majority of available rolling three-year periods up to a maximum of 20, and
  - ➤ equal to or above an appropriate benchmark index over the majority of available rolling three-year periods up to a maximum of 20.

63.    This first requirement prohibited Defendants from selecting Hewitt as an investment manager, and also prohibited Defendants from selecting the Hewitt Funds as investment options for the Plan. Investment managers or funds required a performance record "at least three years long". Yet, Hewitt had no record as an investment manager for defined contribution plans,[29] and the Hewitt Funds had no record at all because the Hewitt Funds were brand new. The only track records Hewitt could have used to attempt to qualify its investment management services or the Hewitt Funds under the IPS would have been back-tested and theoretical;  however, the IPS specifically prohibited back-testing.[30]

---

[29] Any experience Hewitt had outside of defined contribution plans would not count because the investment strategies and objectives were different. The IPS credits only track records that suggest a manager or fund " will meet *the Plan's* investments goals" (emphasis added).

[30] Back-testing would take Hewitt's anticipated investments for the Plan, and the anticipated holdings of the Hewitt Funds, and assume that same the choices had been made more than three years prior to adoption by the Plan. *See* INVESTOPEDIA, "Backtesting", *available at* https://www.investopedia.com/terms/b/backtesting.asp.

64.     Defendants' selection of Hewitt and the Hewitt Funds also violated other requirements of the IPS. The third and sixth requirements state:

- Management – The manager should have a stable corporate structure and consistent tenure, with tenure of five years or greater being a desired fund characteristic.

- Assets Under Management – The manager should have a reasonable client base in this investment style and the level of assets under management should be appropriate given the specific product to be managed.

65.     Defendants' selection of Hewitt and the Hewitt Funds violated the "Management" requirement because Hewitt did not have a stable corporate structure behind its investment management program. Instead, Hewitt was forged by recent mergers of previously unaffiliated consulting firms. Hewitt was finding its way post-merger and seeding new lines of business, namely its investment management program for 401(k) plans and the Hewitt Funds, when Defendants made these selections.

66.     Defendants' selection of Hewitt and the Hewitt Funds also violated the "Assets Under Management" requirement. Although the meaning of "reasonable client base" in an investment style may be subject to debate, having no other clients or assets under management surely does not qualify. Hewitt did not have any other investment management clients or assets under management in investment styles included in the Hewitt Funds, and Defendants' selection violated this provision of the IPS.

67.     Hewitt was responsible for maintenance of the Plan's IPS pursuant to its consulting agreement with the Plan and FirstGroup. Hewitt therefore knew or should have known that selection of the Hewitt funds and selection of Hewitt as the Plan's investment manager was inconsistent with the terms of the IPS (and fiduciary standards under ERISA).  For its part, FirstGroup had to approve any amendments to the IPS, and knew or should have known that the

selection of both Hewitt and the Hewitt funds was inconsistent with the IPS and fiduciary standards.

68. The events that followed (and the timing of those events) reflect a conscious disregard of the interest of Plan participants. Minutes from the Committee's May 22, 2013 meeting state that, after a presentation by Hewitt, Defendants agreed to hire Hewitt as an investment manager, and to overhaul the lineup consistent with Hewitt's recommendations.[31] The *very same* minutes state that the Committee reviewed the existing lineup and "determined that it would be in the best interests of the participants and the beneficiaries in the 401(k) Plan to make no changes to the investments in the 401(k) Plan at this time."

69. The Committee next met on August 29, 2013. The minutes state that the Hewitt Funds would replace the Plan's existing funds once Hewitt assumed its new role, which was "in the process of being implemented". Again, the *very same* minutes stated that it would be in the "best interests of the participants" to "make no changes" to the existing funds. FirstGroup officially signed a new agreement with Hewitt that day, see Decl. of MacAndrew, Ex. D, ECF No. 33-6 at 9 & 12-13 of 13, but the agreement made no mention of the Hewitt Funds discussed at that day's meeting.

70. On September 24, 2013, less than a week before the lineup change occurred, Defendants "amend[ed] and supplement[ed]" their Investment Management Agreement to reflect that FirstGroup (a) authorized replacement of the Plan's investment lineup with the Hewitt Funds, (b) reviewed pertinent information related to the Hewitt Funds, and (c) did not expect Hewitt to

---

[31] Committee minutes and contracts described in paragraphs 67-70 were obtained by Plaintiffs' counsel from the DOL in July 2018 pursuant to a FOIA request for records relating to investigations of the Plan.

consider any potential investments for the Plan other than the Hewitt Funds. *See* Exhibit B, at pp. 1-2.[32] This was imprudent and contrary to the best interest of Plan participants. Aware of the potential legal exposure under ERISA, Defendants sought to ease their liability concerns by simply proclaiming that their conduct was lawful. *See id.* at 2 ("Client and Committee …represent that the direction [to invest in Hewitt Funds] contained in this paragraph are permitted by, and do not violate, applicable law, including ERISA or other rules and regulations promulgated thereunder.").[33] However, merely saying conduct is lawful does not make it so.[34]

## IV.  DEFENDANTS' IMPRUDENT RETENTION OF HEWITT FUNDS IN THE PLAN

71.    The Hewitt Funds experiment has been a failure.  As reflected by the chart below (Illustration 3), the Hewitt Funds have generally underperformed both their market benchmarks and the corresponding funds that Hewitt eliminated from the Plan.[35]

---

[32] Exhibit B was obtained by Plaintiffs' counsel in July 2018 pursuant to a Freedom of Information Act request to the United States Department of Labor (DOL) for records relating to any investigation of the FirstGroup America, Inc. Retirement Savings Plan. Redactions to Exhibit B were made by the DOL, and appear to be limited to the names of individual persons.

[33] FirstGroup's Declaration on file in this action, see Decl. of MacAndrew, ECF No. 33-2, omitted the amended and supplemental agreement (signed September 24, 2013), and therefore falsely represented to the Court that the August 29, 2013 agreement was the operative agreement "as of October 1, 2013." *Id.*, ¶ 5.

[34] *See* Carroll Kilpatrick, *Nixon Tells Editors, "I'm Not a Crook,"* WASHINGTON POST, Nov. 18, 1973; *Allen v. GreatBanc Trust Co.*, 835 F. 3d 670, 679 (7th Cir. 2016) ("[S]aying so does not make it so.") (rejecting fiduciary's self-serving statement that it complied with ERISA).

[35] The performance reported in Illustration 3 includes the period from the inception of the Hewitt funds (Sept. 30, 2013) through the end of the first quarter of 2018 (March 31, 2018).

*Illustration 3: Performance of Hewitt Funds Since Inception*

| | Average Annual Return Since Inception, +/- Fund Benchmark | Average Annual Return Since Inception, +/- Removed Fund(s)[36] |
|---|---|---|
| Aon Hewitt 2010 Retirement Solution Fund | - 1.78% | - 2.69% |
| Aon Hewitt 2015 Retirement Solution Fund | - 1.91% | - 3.08% |
| Aon Hewitt 2020 Retirement Solution Fund | - 1.71% | - 3.15% |
| Aon Hewitt 2025 Retirement Solution Fund | - 1.34% | - 2.79% |
| Aon Hewitt 2030 Retirement Solution Fund | - 1.14% | - 2.45% |
| Aon Hewitt 2035 Retirement Solution Fund | - 1.24% | - 2.40% |
| Aon Hewitt 2040 Retirement Solution Fund | - 1.34% | - 2.51% |
| Aon Hewitt 2045 Retirement Solution Fund | - 1.27% | - 2.47% |
| Aon Hewitt 2050 Retirement Solution Fund | - 1.15% | - 2.41% |
| Aon Hewitt 2055 Retirement Solution Fund | - 1.07% | - 2.39% |
| Aon Hewitt Retirement Income Fund | - 1.39% | - 2.25% |
| Aon Hewitt Core Plus Bond Fund | + 0.19% | + 0.03% |
| Aon Hewitt Inflation Fund | - 1.14% | N/A |
| Aon Hewitt Large Cap Equity Fund | - 1.21% | - 1.29% |
| Aon Hewitt Small & Mid Cap Equity Fund | - 2.46% | + 0.33% |
| Aon Hewitt Non U.S. Equity Fund | + 0.73% | - 1.98% |

72.     As reflected by Illustration 3, the eleven Retirement Funds that constitute the Hewitt target-date series (referred to herein as the "Hewitt Target Date Funds"), have all fared poorly. After weighting the Hewitt Target Date Funds based on the relative proportion of Plan assets allocated to each of those funds, the Hewitt Target Date Funds underperformed their stated benchmarks by an average of 1.49% per year, and have underperformed the T. Rowe Price funds

---

[36] In this column, each Hewitt target date fund is compared to the corresponding T. Rowe Price target date fund offered in the Plan prior to October 1, 2013. Hewitt's Core Plus Bond and Non-U.S. Equity funds are compared to the similar funds offered in the Plan prior to October 2013 (the PIMCO Total Return Fund and American Funds EuroPacific Growth Fund, respectively). Hewitt's Large Cap Equity fund is compared to a composite portfolio of large cap equity funds offered in the Plan prior to October 2013, weighted according to participants' level of investment in the replaced large cap equity funds (the Wells Fargo S&P 500 fund, Dodge & Cox Stock fund, and Mainstay Large Cap Growth fund). Similarly, Hewitt's Small & Mid Cap Equity fund is compared to a composite portfolio of small and mid cap equity funds offered in the Plan prior to October 2013, weighted according to Plan participants' level of investment in the replaced small and mid cap equity funds (the Wells Fargo Small Cap Value fund, Artisan Mid Cap Value fund, Baron Growth fund, and Morgan Stanley Mid Cap Growth fund).

that they replaced by an average of 2.76% per year.[37]  The Hewitt's Target Date Funds hold more than 80% of the investable assets of the Plan, according to the Plan's most recent Form 5500 filing. As a result, Defendants' selection and retention of these funds has caused significant losses to the Plan.

73.     The other five Hewitt Funds (Core Plus Bond, Inflation, Large Cap Equity, Small & Mid Cap Equity, and Non-U.S. Equity), referred to herein as the "Hewitt Asset Class Funds," also have fared poorly. After weighting the Hewitt Asset Class Funds based on the relative proportion of Plan assets allocated to each of those funds, the Hewitt Asset Class Funds underperformed their stated benchmarks by an average of 1.12% per year, and also underperformed the asset class funds they replaced by an average of 0.79% per year.[38] This has caused significant additional losses to the Plan.

74.     This underperformance should have come as no surprise to Defendants, given the experimental nature of the funds and Hewitt's overall lack of experience as a fund manager.[39]

75.     Yet, in spite of Hewitt's lack of relevant experience, the underperformance of Hewitt Funds, and the losses that those funds have caused to the Plan, Defendants have continued to retain each and every one of the Hewitt Funds listed above in the Plan. Defendants have not

---

[37] The Hewitt Target Date Funds use a "fund of funds" structure and invest in other Hewitt Funds. Thus, the failure of the Hewitt Target Date Funds reflects the deficiencies of Hewitt's propriety funds venture at large.

[38] Because Hewitt's Inflation fund did not replace a similar option in the Plan prior to October 2013, the Inflation fund is not included in the performance comparison between the Hewitt Asset Class Funds and the replaced asset class funds.

[39] Although Hewitt did have experience evaluating other fund managers as an investment consultant, Hewitt's duties as an investment manager of the Hewitt Funds were far greater than those of a consultant. Further, at the time the Hewitt Funds were launched, Hewitt did not have a published, GIPS-compliant performance history documenting its success or lack thereof as a consultant in recommending managers or performing any other tasks.

replaced any of the Hewitt Funds or transferred the Plan's assets in any of those funds to a more appropriate investment. This constitutes a separate and continuing breach of Defendants' fiduciary obligations under ERISA. In the face of such unambiguous and objective data, prudent and unbiased fiduciaries would not continue to hold the Hewitt Funds.

76.     Indeed, despite Hewitt's marketing and sales efforts, the Hewitt Funds remain unpopular among fiduciaries of similarly-sized plans in the 401(k) plan marketplace. According to the most recent public information available, only five other plans with assets of $250 million or more (out of more than 2,600 such plans) have adopted any of the Hewitt Funds, and only two other such plans have adopted the Hewitt target date funds.

## IV.     LOSSES TO THE PLAN AND WRONGFUL PROFITS TO HEWITT

77.     As a result of Defendants' imprudent selection and retention of the Hewitt Funds, and transfer of over a quarter billion dollars in Plan assets into those funds, the Plan has suffered tens of millions of dollars in investment losses. Defendants are jointly and severally liable to the Plan for these losses pursuant to 29 U.S.C. § 1109.

78.     While the Plan's retention of Hewitt Funds has been harmful to the Plan, it has been profitable for Hewitt. Hewitt has received substantial additional fees as a result of the Plan's quarter billion dollar investment in these funds. In addition, Hewitt was able to leverage the Plan's investment in the Hewitt target-date fund series as seed money to prop up its other incipient funds, as each Hewitt target-date fund is a "fund of funds" that invests in other underlying Hewitt Funds.

79.     In addition to restoring the Plan's losses, Hewitt is obligated to disgorge the profits that it received on account of its fiduciary breaches pursuant to 29 U.S.C. §§ 1109 and 1132(a)(3).

V.    PLAINTIFFS LACK OF KNOWLEDGE OF DEFENDANTS' VIOLATIONS OF ERISA

80.    Plaintiffs did not have knowledge of all material facts (including, among other things, Hewitt's inexperience as a manager of funds for defined contribution plans; the importance of Hewitt's incipient funds to its business expansion;  Hewitt's need for seed money for its funds, and the tainted recommendations Hewitt made to the Plan and its other investment consulting clients while it sought seed money for the funds; the Plan's unique status as the first plan in the country to adopt the Hewitt Funds; the requirements of the IPS, and facts surrounding supposed changes to the IPS; the continuing unpopularity of the Hewitt Funds in the retirement plan marketplace since they were launched; and the performance of the Removed Funds in relation to the Hewitt Funds after they were removed from the Plan), until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making and monitoring processes with respect to the Plan, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Second Amended Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

81.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to seek the remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary to bring suit for injunctive or other equitable relief. Plaintiffs seek certification of this action as a class action pursuant to these statutory provisions and Fed. R. Civ. P. 23.

82. Plaintiffs assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows:[40]

> All participants and beneficiaries of the FirstGroup America, Inc. Retirement Savings Plan at any time on or after October 1, 2013 who had any portion of their account invested in Hewitt Funds, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plan's investment or administrative functions.

83. Numerosity:  The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 13,000 participants during the putative class period, and most of those participants were invested in Hewitt Funds during the class period.

84. Typicality:  Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs participated in the Plan, invested in Hewitt Funds, and suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants managed the Plan as a single entity, and treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal decisions affected all class members similarly.

85. Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

---

[40] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

86.    <u>Commonality</u>:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.    Whether Defendants are fiduciaries of the Plan, and the scope of their fiduciary duties;

b.    Whether the Plan's fiduciaries breached their fiduciary duties under 29 U.S.C. § 1104 by engaging in the conduct described herein;

c.    Whether the Plan's fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein under 29 U.S.C. § 1105;

d.    Whether FirstGroup breached its duty to monitor other Plan fiduciaries;

e.    The proper form of equitable and injunctive relief; and

f.    The proper measure of monetary relief.

87.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

88.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of particular Plan investments or removal of a Plan fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of Plan assets that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

89.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Second Amended Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104

90.     Plaintiffs repeat and re-allege Paragraphs 1 through 89 of the Second Amended Complaint as though fully set forth herein.

91.     Defendants are or were fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

92.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon the Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.  Section 404(a) of ERISA, 29 U.S.C. § 1104(a), provides:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

    (A)    for the exclusive purpose of

        (i)    providing benefits to participants and their beneficiaries; and

        (ii)    defraying reasonable expenses of administering the plan; [and]

    (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

93. These fiduciary duties are continuing in nature, and apply to both the selection of investments for the Plan and the subsequent monitoring, retention, removal, and replacement of those investment options. *Tibble*, 135 S. Ct. at 1828.

94. Defendants breached their fiduciary duties by selecting Hewitt Funds for the Plan, designating the Aon Hewitt Retirement Solution target-date fund series as the Plan's default investment option (instead of the existing T. Rowe Price target-date fund series, or other established target-date funds), causing the Plan to transfer over $250 million in assets into the Hewitt Funds from the Removed Funds, retaining Hewitt Funds in spite of their ongoing underperformance, and engaging in the other acts and practices described herein. These acts and practices were neither prudent nor in the interest of Plan participants and beneficiaries, and benefitted Hewitt to the detriment of Plan participants and beneficiaries.

95. A prudent fiduciary acting solely in the interest of Plan participants and beneficiaries would not have selected or retained Hewitt Funds for the Plan, given their lack of an established track record, poor performance history after they were launched, unpopularity among retirement plan fiduciaries, and other undesirable attributes.

96.     A prudent fiduciary acting solely in the interest of Plan participants and beneficiaries also would not have replaced the Removed Funds with the Hewitt Funds, and caused the Plan to transfer over $250 million in assets from the Removed Funds to the Hewitt Funds, given the generally positive performance history of the Removed Funds, the lack of a similar performance history for the Hewitt Funds, the overall superiority of the Removed Funds to the Hewitt Funds, and the differences in characteristics between the Removed Funds and the Hewitt Funds.

97.     Defendants compounded their fiduciary breaches, and committed separate and independent fiduciary breaches, by failing to appropriately monitor the Hewitt Funds and retaining Hewitt Funds in the Plan despite their ongoing underperformance, unpopularity, and undesirability.

98.     The process that led to the selection and retention of Hewitt Funds for the Plan, and the transfer of Plan assets into those funds, was imprudent and tainted by Hewitt's self-interest. FirstGroup failed to properly take account of Hewitt's conflicted role in recommending the Hewitt Funds for the Plan and failed to take proper steps to mitigate such conflict. A scrupulous and independent investigation (as required under these circumstances) would have revealed that the Hewitt Funds were not appropriate investments for the Plan. Indeed, even a basic investigation consistent with the ordinary standard of care would have revealed that the Hewitt Funds were not appropriate investment options, as the Hewitt Funds were experimental funds with no track record at the time they were included in the Plan, and no other retirement plans included the Hewitt Funds at the time they selected for the Plan. Further, a prudent fiduciary acting in the best interests of the Plan would have promptly removed the Hewitt Funds from the Plan based on their sub-standard

performance after they were launched, and their continuing unpopularity among other retirement plan fiduciaries.

99.     Defendants' fiduciary breaches resulted in significant losses to the Plan. Each Defendant is personally liable, and Defendants are jointly and severally liable, for these losses under 29 U.S.C. §§ 1109(a) and 1132(a)(2).

100.     Defendants' fiduciary breaches also resulted in wrongful profits to Hewitt, which Hewitt is obligated to disgorge to the Plan under 29 U.S.C. §§ 1109(a), 1132 (a)(2), and 1132(a)(3).

101.     In addition, Defendants are liable for injunctive relief, equitable relief, and other appropriate relief, as provided by 29 U.S.C. §§ 1109(a), 1132 (a)(2), and 1132(a)(3), and reasonable attorneys' fees and expenses as provided by 29 U.S.C. § 1132(g).

102.     Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties; and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, in addition to being directly liable for the foregoing breaches, each Defendant is also derivatively liable to the Plan for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Breach of Duty to Follow Plan Document**
**29 U.S.C. § 1104(a)(1)(D)**

103.    Plaintiffs repeat and re-allege Paragraphs 1 through 102 of the Second Amended Complaint as though fully set forth herein.

104.    Defendants were fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21).

105.    Defendants were required to exercise their fiduciary duties "in accordance with documents and instruments governing the [P]lan".

106.    The IPS was formally adopted by vote of the Committee as the official policy governing the investments of the Plan. The IPS established minimum requirements for selection of investments managers or funds, as described in this Second Amended Complaint, and as set forth in Exhibit A.

107.    Defendants jointly violated the IPS by recommending and authorizing the selection of Hewitt as an investment manager of the Plan and the selection of the Hewitt Funds as investment options of the Plan. These choices failed to satisfy the requirements of the IPS.

108.    Defendants' failure to follow the IPS resulted in significant losses to the Plan. Each Defendant is personally liable, and Defendants are jointly and severally liable, for these losses under 29 U.S.C. §§ 1109(a) and 1132(a)(2).

109.    Defendants' violations of the IPS also resulted in wrongful profits to Hewitt, which Hewitt is obligated to disgorge to the Plan under 29 U.S.C. §§ 1109(a), 1132 (a)(2), and 1132(a)(3).

**COUNT III**
**Failure to Monitor Fiduciaries**

110.    Plaintiffs repeat and re-allege Paragraphs 1 through 109 of the Second Amended Complaint as though fully set forth herein.

111.    Defendants were fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21).

112.    The Company appointed the other fiduciaries of the Plan, including the Committee and Hewitt, and had the responsibility to monitor its appointed fiduciaries, promptly take corrective action in the event that they failed to prudently and appropriately discharge their duties, and remove them if necessary.

113.    To the extent that the Company's fiduciary monitoring responsibilities were delegated, this monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

114.    The Company breached its fiduciary monitoring duties by, among other things:

   a.   Failing to appropriately monitor and evaluate Hewitt's performance (or the Committee's performance) or have a system in place for doing so;

   b.   Failing to monitor the process by which Hewitt was retained as an investment manager and the Hewitt Funds were selected and retained for the Plan, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

   c.   Failing to take any corrective action to address the fiduciary breaches described herein, standing idly by as the Plan suffered significant losses as a result of imprudent and disloyal actions and omissions with respect to the Plan; and

   d.   Ignoring Hewitt's conflicts of interest and granting Hewitt carte blanche to make self-interested investment recommendations.

115.    As a consequence of the Company's failure to carry out its fiduciary monitoring duties, the Plan suffered millions of dollars in investment losses.

116. The Company is liable for these losses and other appropriate relief as provided by 29 U.S.C. §§ 1109 and 1132, on account of its failure to appropriately monitor Hewitt and the Committee, and subsequent failure to take prompt and effective action to rectify their fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A declaration that Defendants have breached their fiduciary duties under ERISA;

D. A declaration that the Company breached its fiduciary duty to monitor Hewitt and the Committee;

E. An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

F. An accounting of profits earned by Hewitt and a subsequent order requiring Hewitt to disgorge all profits resulting from its fiduciary breaches or otherwise received from, or in respect of, the Plan during the putative class period;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust or a surcharge against Hewitt to prevent its unjust enrichment from unlawful transactions involving the Plan;

I. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including modification of the Plan's

investment lineup and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

J.      An award of pre-judgment interest;

K.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

L.      An award of such other and further relief as the Court deems equitable and just.

Dated: September 30, 2021                    **NICHOLS KASTER, PLLP**

By: /s/ Kai H. Richter
Kai H. Richter, MN Bar No. 0296545*
Paul J. Lukas, MN Bar No. 22084X*
Carl F. Engstrom, MN Bar No. 0396298*
Brandon McDonough, MN Bar No. 0393259*
Mark E. Thomson, MN Bar No. 0398260*
      * admitted *pro hac vice*
80 S 8th Street, #4600
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
krichter@nka.com
cengstrom@nka.com
bmcdonough@nka.com
mthomson@nka.com

**FREKING MYERS & REUL**

George M. Reul, Jr. (0069992)
600 Vine Street, Suite 900
Cincinnati, Ohio 45202
Telephone: 513-721-1975
Facsimile: (513) 651-2570
greul@fmr.law

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies on this 30th day of September, 2021, that the undersigned

electronically filed and served the foregoing document through this Court's ECF system.

*/s/ Kai H. Richter*
Kai H. Richter
