# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| Wendy Berry, Lorri Hulings, and Kathleen Sammons, individually and as representatives of a class of similarly situated persons, and on behalf of the FirstGroup America, Inc. Retirement Savings Plan, | Case No. 1:18-cv-00326-MWM<br><br>Judge Matthew W. McFarland |
| Plaintiffs, | |
| v. | |
| FirstGroup America, Inc., FirstGroup America, Inc. Employee Benefits Committee, and Aon Hewitt Investment Consulting, Inc., | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE FGA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................v

SUMMARY OF ARGUMENT .......................................................................................v

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND...........................................................................................1

I.    THE COMMITTEE HIRES AON WITH VIRTUALLY NO DUE DILIGENCE ....................................1

II.   AON TARGETED THREE COMMITTEE MEMBERS BEHIND THE SCENES USING A BAIT-AND-SWITCH PLOY ...................................................................................................................3

III.  THE COMMITTEE LEAPT BEFORE IT LOOKED .....................................................................4

IV.   THE COMMITTEE RELIED ON ITS UNSUBSTANTIATED "BELIEF" THAT AON WAS QUALIFIED .......................................................................................................................5

V.    THE COMMITTEE TRUSTED, BUT NEVER VERIFIED .............................................................8

ARGUMENT ................................................................................................................11

I.    THE COMMITTEE FAILED TO UTILIZE A PRUDENT PROCESS FOR SELECTING AON AS THE PLAN'S DELEGATED INVESTMENT MANAGER ................................................................12

II.   THE COMMITTEE FAILED TO APPROPRIATELY MONITOR AON AND THE AON FUNDS .........17

III.  THE FGA DEFENDANTS' BREACHES UNDOUBTEDLY RESULTED IN A LOSS TO THE PLAN ..20

CONCLUSION .............................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Accardi v. McGuire, Woods & Battle*,
    734 F.2d 10 (4th Cir. 1984) ...........................................................................................16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................. viii, 11

*Baird v. BlackRock Inst. Tr. Co.*,
    2021 WL 105619 (N.D. Cal. Jan. 12, 2021) ...................................................................23

*Bd. of Trustees of S. California IBEW-NECA Defined Contribution Plan v. Bank of New York
Mellon Corp.*,
    2011 WL 6130831 (S.D.N.Y. Dec. 9, 2011) ............................................................. vi, 11

*Brotherston v. Putnam Invs., LLC*,
    907 F.3d 17 (1st Cir. 2018).............................................................................................22

*Cassell v. Vanderbilt Univ.*,
    285 F. Supp. 3d 1056 (M.D. Tenn. 2018).......................................................................13

*Cates v. Columbia Univ.*,
    2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019) ..........................................................11, 20

*Chao v. Hall Holding Co.*,
    285 F.3d 415 (6th Cir. 2002) ................................................................................ *passim*

*Cryer v. Franklin Res., Inc.*,
    2018 WL 6267856 (N.D. Cal. Nov. 16, 2018) ........................................................11, 16

*Davidson v. Cook*,
    567 F. Supp. 225 (E.D. Va. 1983) ..................................................................................16

*Dilts v. United Group Servs., LLC*,
    500 Fed. Appx. 440 (6th Cir. 2012)................................................................................12

*Donovan v. Bierwirth*,
    754 F.2d 1049 (2d Cir. 1985)..........................................................................................22

*Donovan v. Cunningham*,
    716 F.2d 1455 (5th Cir. 1983) ........................................................................................14

*Evans v. Akers*,
    534 F.3d 65 (1st Cir. 2008)..............................................................................................20

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014) ............................................................................ 20

*Forman v. TriHealth, Inc.*,
    40 F.4th 443 (6th Cir. 2022) ............................................................. 12

*Garthwait v. Eversource Energy Co.*,
    2022 WL 3019633 (D. Conn. July 29, 2022) ................................... 20

*Gregg v. Transp. Workers of Am. Int'l*,
    343 F.3d 833 (6th Cir. 2003) ............................................. 12, 15, 17

*Howard v. Shay,*
    100 F.3d 1484 (9th Cir. 1996) ................................................. 12, 17

*Kuper v. Iovenko*,
    66 F.3d 1447 (6th Cir. 1995) ............................................................ 20

*Laster v. City of Kalamazoo*,
    746 F.3d 714 (6th Cir. 2014) ........................................................... 11

*Liss v. Smith*,
    991 F. Supp. 278 (S.D.N.Y. 1998) ................................................... 15

*Marshall v. Northrop Grumman Corp.*,
    2019 WL 4058583 (C.D. Cal. Aug. 14, 2019) ................................ 16

*Mohler v. Unger*,
    1994 WL 1860578 (S.D. Ohio Aug. 26, 1994) ............................... 12

*Moitoso v. FMR LLC*,
    451 F. Supp. 3d 189 (D. Mass. 2020) ............................................ 14

*Pfeil v. State St. Bank & Tr. Co.*,
    806 F.3d 377 (6th Cir. 2015) ...................................................... 1, 12

*Phillips v. Cohen*,
    400 F.3d 388 (6th Cir. 2005) ........................................................... 15

*Ramos v. Banner Health,*
    2019 WL 1777524 (D. Colo. Apr. 23, 2019) .................................. 20

*Ramos v. Banner Health*,
    461 F. Supp. 3d 1067 (D. Colo. 2020) ............................................ 18

*Ramos v. Banner Health*,
    1 F.4th 769 (10th Cir. 2021) ................................................................18, 22

*Reetz v. Lowe's Cos.*,
    2021 WL 535160 (W.D.N.C. Feb. 12, 2021) ..................................................16

*Reetz v. Lowe's Cos.*,
    2021 WL 4771535, at *46 (W.D.N.C. Oct. 12, 2021)...........................14, 15, 18

*Sacerdote v. New York Univ.*,
    1:16-cv-06284, Dkt. 174 (S.D.N.Y. Feb. 22, 2018) ........................................16

*Sacerdote v. N.Y. Univ.*,
    328 F. Supp. 3d 273 (S.D.N.Y. 2018)..............................................................14

*Sacerdote v. New York Univ.*,
    9 F.4th 95 (2d Cir. 2021) ...............................................................................19

*Seawell v. Brown*,
    2010 WL 4683952 (S.D. Ohio Nov. 10, 2010)..........................................11, 12

*Sec'y of U.S. Dep't of Lab. v. Gilley*,
    290 F.3d 827 (6th Cir. 2002) ..........................................................................23

*Sims v. BB&T Corp.*,
    2018 WL 3128996 (M.D.N.C. June 26, 2018) ..........................................16, 17

*Tatum v. RJR Pension Inv. Comm.*,
    761 F.3d 346 (4th Cir. 2014) ..........................................................................15

*Terraza v. Safeway Inc.*,
    2019 WL 12872958 (N.D. Cal. Apr. 16, 2019) ...................................11, 20, 23

*Tibble v. Edison Int'l*,
    575 U.S. 523 (2015)........................................................................... vii, 17

*Tracey v. Massachusetts Inst. of Tech.*,
    404 F. Supp. 3d 356 (D. Mass. 2019) ...................................................... vii, 12

## Rules, Regulations, and Statutes

Fed. R. Civ. P. 56(c) .............................................................................................11

29 U.S.C. § 1104(a)(1)(B) ........................................................................... vi, 1, 12

## PRELIMINARY STATEMENT

The Second Amended Complaint contains three Counts against the FGA Defendants and Aon Hewitt Investment Consulting, Inc. ("Aon"): Count I alleges breaches of the duties of loyalty and prudence, Count II alleges a breach of the duty to follow plan documents (specifically, the Plan's Investment Policy Statement), and Count III alleges a failure by First Group America, Inc. to monitor the Committee. (Second Amended Complaint, ECF No. 71.) While Aon has agreed to settle all of these claims, the FGA Defendants now move for summary judgment on all three Counts. In light of the settlement with Aon and in the interest of streamlining this matter for trial, avoiding duplicative arguments, and focusing the Court's attention on the matters genuinely in dispute, Plaintiffs do not oppose (i) dismissal of the loyalty claims against the FGA Defendants under Count I; (ii) dismissal of Count II as a stand-alone claim;[1] and (iii) dismissal of Count III. Thus, for the reasons explained in this memorandum, the core issue for trial is the imprudence of FGA's process for engaging, retaining, and monitoring Aon and the Aon funds, as alleged under Count I.

## SUMMARY OF ARGUMENT

Defendants are not entitled to summary judgment on the issue of whether the process they used to retain and monitor Aon as the delegated investment fiduciary for the FirstGroup America, Inc. Retirement Savings Plan ("the Plan") complied with ERISA's strict duty of prudence. This issue is intensely fact-based and requires a holistic evaluation of the acts and omissions of defendants to determine whether they acted "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

---

[1] While Plaintiffs do not oppose dismissal of Count II as a stand-alone claim, they reserve the right to rely on evidence regarding the Committee's failure to follow the Plan's Investment Policy Statement in support of their claim of imprudence under Count I.

v

matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "Rarely will such a determination be appropriate on a motion for summary judgment." *Bd. of Trustees of S. California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon Corp.*, 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011). This case is no exception.

There is ample evidence in the record establishing that Defendants did not utilize a prudent process in initially selecting Aon and the Aon funds. The entirety of the Committee's due diligence process consisted of a single meeting during which the Committee heard a sales pitch from Aon and promptly decided to hire Aon for the role, all of which took less than an hour. Aon's sales pitch was not on the agenda for the meeting, and no information was provided to the Committee in advance. Contrary to its typical practices, the Committee did not issue a request for proposals ("RFP") or otherwise investigate alternative service providers. Prior to the meeting, the Committee had never discussed engaging a delegated fiduciary for the Plan, and three of the eight voting members of the Committee were not present at the meeting and did not find out about the decision until after the fact. Meanwhile, there was no independent analysis of Aon's projected fees and performance—both of which turned out to be significantly less favorable than promised. Moreover, the Aon funds did not even exist yet, and the Committee had no information about Aon's experience and skill (or lack thereof) in managing funds for 401(k) plans.

Indeed, the one piece of concrete data that the Committee did have available at the time, but which they apparently failed to review, was Aon's track record managing funds for First Group's defined benefit pension plan. ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ something that should have sharply called into

question Aon's promise of improved performance for the Aon funds it was pitching for the Plan. This is especially true given that the Plan's existing lineup of investments was performing well and included a best-in-class suite target date funds ("TDFs") managed by T. Rowe Price, all of which the Committee authorized Aon to replace with Aon's new, untested funds.

These facts speak for themselves. But Plaintiffs also offer substantial expert testimony establishing that the Committee's process was inconsistent with the standard of care observed in the industry. In such cases, courts routinely deny motions for summary judgment. *See, e.g., Tracey v. Massachusetts Inst. of Tech.,* 404 F. Supp. 3d 356, 363 (D. Mass. 2019) ("[O]pinions of the parties' experts as to the proper industry protocol . . . are in stark contrast. Both parties also present competing narratives surrounding the decision not to conduct an RFP. Because those disputes are more than superficial, the Court concludes that they are best resolved at trial.").

Following the Committee's hasty and ill-advised decision to engage Aon and the Aon funds, the record also demonstrates that the Committee failed in its "continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). Despite almost immediate indications that Aon would not be able to deliver either the fee savings or the improved performance that its sales pitch promised, the Committee took no steps to independently analyze Aon's poor performance and instead passively relied on the recommendations of Aon's consultants to make no changes to the Plan's investments. Meanwhile, internally Aon personnel recognized ███████████████████████████████

Once the Committee finally decided to take action, it moved at a glacial pace, delaying action for four years due to corporate concerns rather than the prudent management of the Plan. And, ironically, once Aon was finally terminated and a new delegated fiduciary was in place, the Aon TDFs were removed from the Plan and replaced with ███████████████████

█████ Again, in addition to this ample factual record, Plaintiffs offer significant expert testimony that the Committee's process was inconsistent with the standard of care observed in the industry.

Finally, Defendants are simply wrong in their argument that there is insufficient evidence of a causal link between these deficiencies in the Committee's process and the damages calculated by Plaintiffs' damages expert. These damages were calculated using two models, one that compared the performance of the Aon funds to the lineup of "legacy" funds that were removed from the Plan when Aon took over in 2013, and the other comparing the performance of the Aon TDFs to a suite of passively managed TDFs from fund manager State Street. The first model is well supported, given that ████████████████████ The State Street model is also grounded in the record, as Aon itself advised the Committee ████████████████

Though Defendants clearly wish it were not so, the evidence in this case is far from being "so one-sided that [Defendants] must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Accordingly, their request for summary judgment should be denied.

## INTRODUCTION

The central issue for trial in this case is whether the FirstGroup Defendants employed a prudent process for selecting and retaining an investment manager, and for monitoring the Plan's investment options. To resolve this issue, this Court must determine whether the Committee acted "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). In other words, this Court must decide, among other things:

(1)      whether a prudent fiduciary would forego a diligent review process when selecting an investment manager, based on the unsubstantiated "belief" that an existing service provider was qualified for the role;

(2)      whether a prudent fiduciary would select an inexperienced investment manager, knowing that investment manager would replace a top-tier suite of target date funds with untested, unfunded, and undeveloped proprietary investments; and

(3)      whether a prudent fiduciary would rely on an inexperienced investment manager's self-assessment in lieu of independently evaluating whether chronic underperformance merited the retention of that manager, or their funds.

The undisputed facts in this case plainly establish that the Committee's conduct fell far short of ERISA's exacting standards—the highest duties known to law. *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002). However, because the Parties vehemently dispute "the appropriateness of [Defendants'] methods" for making fiduciary decisions, Defendants' motion for summary judgment as to their duties of prudence must be denied. *See Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 385 (6th Cir. 2015).

## FACTUAL BACKGROUND

### I.    THE COMMITTEE HIRES AON WITH VIRTUALLY NO DUE DILIGENCE

On May 22, 2013, in the span of a single discussion lasting no more than an hour, the FirstGroup America Inc. Employee Benefits Committee (the "Committee") voted to appoint their

investment advisor, Aon Hewitt Investment Consulting, Inc. ("Aon"), as a "delegated fiduciary" for the FirstGroup America, Inc. Retirement Savings Plan ("the Plan"), giving Aon nearly complete control over the investment of more than $250 million in employee retirement savings held in the company's 401(k) plan. Plaintiffs' Statement of Proposed Disputed Issues of Material Fact ("PSOF") ¶¶ 98, 99, 131. ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ PSOF ¶¶ 90, 92. Other than listening to Aon's sales pitch, the Committee performed no independent due diligence to determine whether the information in Aon's pitch was accurate, to evaluate Aon's qualifications for the role, to compare the performance of Aon's funds to the Plan's existing investment lineup, to compare Aon's fees to those of other providers, or to investigate other possible solutions for the Plan. PSOF ¶¶ 98-100.

At the time, the Plan's existing investments were performing exceptionally well. This "legacy" fund lineup had been selected and monitored by the Committee using a set of well recognized fiduciary guidelines set forth in the Committee's Investment Policy Statement ("IPS"). PSOF 24-39, 46-47. These legacy funds included a suite of twelve target-date funds ("TDFs") managed by T. Rowe Price that were among the best—if not *the* best—in class. Every one of the Plan's legacy TDFs had beaten its benchmark over the prior 5- and 10-year periods, with several TDFs ranking in the *top one percent* among peers over the last 10 years. PSOF ¶ 47. All of the Plan's TDFs and nearly every other fund in the legacy lineup were in the top half of their peer groups over the prior 5- and 10-year periods. PSOF ¶¶ 168-169. In fact, just minutes before Aon gave its pitch to scrap this lineup and replace it with a set of Aon-managed funds, both Aon and the Committee agreed that "it would be in the best interests of the participants and beneficiaries in

the 401(k) Plan to make no changes to the investments in the 401(k) Plan . . ." PSOF ¶ 49.

Aon's funds could not boast a similarly impressive track record because, at the time, they did not exist. Nor could Aon claim to have a proven history of success managing 401(k) plan investments because, prior to that time, it never had. ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

To be sure, in 2013 Aon did have some limited experience as a delegated fiduciary for defined benefit ("DB") plans. For example, Aon had served as the delegated fiduciary for FirstGroup's DB plan since sometime in 2009 or 2010, and several Committee members cited this experience as a basis for their decision to engage Aon. But Aon's performance as delegated fiduciary on the DB side was hardly encouraging. ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Nevertheless—despite the exceptional performance of the Plan's legacy funds, ███████████████████████████

██████████████████████████████████████████—the Committee approved the transition to Aon and Aon's funds without even bothering to consider any alternative course of action.

## II. AON TARGETED THREE COMMITTEE MEMBERS BEHIND THE SCENES USING A BAIT-AND-SWITCH PLOY

Prior to its presentation to the Committee in May 2013, Aon targeted three Committee members behind the scenes. As a late-entrant to the delegated DC market, Aon had developed a strategy to "[c]ross-sell" its new delegated services to its existing consulting clients. PSOF ¶ 55.

Aon immediately targeted First Group as part of this campaign. Following a Committee meeting in February 2013, Aon's consultants to the Committee began discussing how to leverage the Committee's concern about the Plan's over-allocation to a stable value fund[2] as a way to pitch Aon's delegated DC service. PSOF ¶ 66-67. The Aon consultants invited three committee members to a meeting to discuss "Stable Value Fund in 401(k) Plan," PSOF ¶ 68, but then, in a classic bait-and-switch, instead used the meeting to pitch its new delegated fiduciary services. PSOF ¶¶ 72-73.

Varying combinations of Aon consultants and one or more of these three Committee members met one or two more times prior to the full Committee meeting on May 23, 2013—details in the record are vague and conflicting. PSOF ¶¶ 67-80, 87-88; *see also* Plaintiffs' Response to the FGA Defendants' Statement of Proposed Undisputed Facts ¶¶ 70-71, 73, 77-79. The purpose and outcome of these meetings is equally unclear: Aon believed it had already been hired before the full Committee meeting and one Committee member, Christian Gartner, agreed that this was "a foregone conclusion," PSOF ¶¶ 83-84, 86; another, John Chilman, testified that no decision had been made to hire Aon and the only purpose was to determine whether to allow Aon to present its pitch to the full Committee, PSOF ¶ 85. In any event, these meetings were not disclosed to other members of the Committee. PSOF ¶ 89.

## III. THE COMMITTEE LEAPT BEFORE IT LOOKED

Without any advanced warning to the Committee, Aon's consultants delivered their sales pitch at the May 22, 2013, Committee meeting. PSOF ¶¶ 90-92. The pitch centered on an Aon slide deck that was not provided to the Committee prior to the meeting. PSOF ¶ 92. In its pitch,

---

[2] A stable value fund is a type of bond fund whose returns are guaranteed through an insurance arrangement, but which typically has lower returns than equity funds and other bond funds commonly found in retirement plan lineups. *See* Investopedia, Stable Value Fund Defined, available at https://www.investopedia.com/terms/s/stable-value-fund.asp.

Aon made clear that it intended to replace the whole Plan lineup with Aon proprietary funds (which did not yet exist), and the Committee understood that. PSOF ¶ 93. Incredibly, Aon told the Committee that Aon expected its TDFs to outperform the Plan's existing TDFs by 50 basis points (*i.e.*, 0.50%) every year, leading to tens of thousands of dollars of increased retirement savings for Plan participants. PSOF ¶ 94. Aon's presentation provided no support for this assertion, which was all the more remarkable given that the Plan's existing TDFs were among the highest performing in the marketplace. PSOF ¶ 95. Aon made similar suggestions elsewhere in its pitch, professing that it would "increase investment returns," "help improve performance," "Improve[] Outcomes," and provide "Performance beyond the fiduciary standard." PSOF ¶ 96. No one on the committee asked for the basis for these claims. PSOF ¶ 96. Upon Aon concluding its sales pitch, the Committee decided to delegate full investment management authority for all Plan assets to Aon. PSOF ¶ 98.

## IV. THE COMMITTEE RELIED ON ITS UNSUBSTANTIATED "BELIEF" THAT AON WAS QUALIFIED

At the time, the Committee did *not* know:

- whether Aon had an existing track record as a delegated fiduciary provider for defined contribution plans;

- whether FirstGroup would be Aon's first delegated fiduciary client in the defined contribution marketplace;

- whether other service providers were capable of acting as the Plan's investment manager;

- whether Aon's fees were commensurate with any other service provider capable of acting as the Plan's investment manager.

PSOF ¶ 100.

Moreover, it is undisputed that the Committee did *not* discuss:

- whether issuing a Request for Proposals (RFP) was warranted under the circumstances;

- whether the circumstances warranted hiring an independent advisor to assist the Committee with its decision;

- whether Aon's role as the Plan's delegated fiduciary would present a potential conflict of interest that would interfere with its role as the Plan's investment advisor;

- whether, in light of the potential conflict, the Committee would benefit from terminating Aon's role as a 3(21) advisor and hiring a new investment advisor to monitor Aon's performance as a delegated fiduciary;

- whether Aon could be hired as a delegated fiduciary without using their own funds;

- whether the terms of the Investment Management Agreement were appropriate; or

- whether it was appropriate to agree that Aon could carry out its obligations under the IMA by selecting exclusively from its own funds.

PSOF ¶ 101.

The Committee also failed to consider whether Aon's proprietary funds were appropriate

investment options for the Plan. For example, members of the Committee did *not* know:

- that Aon's proprietary TDF suite did not yet exist at the time the Committee selected Aon to be the Plan's investment manager;

- that Aon had not decided the glide path that would set the asset allocation for each vintage over time;

- whether the individuals responsible for making asset allocation decisions for the funds were "any good at allocation decisions," or had significant experience with respect to building target date funds and glide paths;

- whether the funds would have sufficient assets under management to be able to achieve the desired asset allocation;

- whether the funds would have sufficient assets under management to attract the desired fund managers;

- whether the funds needed to reach a certain level of assets under management to achieve the projected fee savings;

- whether the projected savings could be achieved through other means; or

- that FirstGroup would be the first to invest in Aon's funds.

PSOF ¶ 102.

6

And the Committee did ***not*** consider:

- whether the Committee should wait to change the Plan's lineup until the Aon funds had offering statements, prospectuses, or other description of the funds available for review; or

- whether the Committee should wait to change the Plan's lineup until the Aon funds showed a positive performance history.

PSOF ¶ 103.

At a basic level, the Committee also failed to consider whether Aon's lofty promises were too good to be true. A review of Aon's sales materials reveals that Aon's estimates of Plan expenses and projected savings were unreliable from the start. For example, Aon's sales pitch relied on outdated line-up information, including investments and share classes that the Committee had already voted to eliminate from the Plan. PSOF ¶ 110. In addition, Aon's estimates did not contemplate the effects of the Committee's other decisions (such as re-enrollment) would have on the Plan expenses. PSOF ¶ 111. But the Committee did not question Aon's estimates, and thus did not ask for Aon to update its projections, consider whether savings would be eliminated by the transition costs borne by participants, or inquire into how many participants would benefit from Aon's projected savings. PSOF ¶ 112. ███████████████████████████████

████████████████████████████████████████████████

███████████████████████ Accordingly, even before the Committee's decision had taken full effect, it was clear that one of FirstGroup's key considerations for the complete overhaul of the Plan's lineup would not materialize.

Later in the transition period, FGA and Aon executed an Investment Management Agreement. Mr. Gartner signed on behalf of the Committee. Shortly thereafter, Mr. Gartner signed an amendment to the Investment Management Agreement that purportedly authorized Aon to carry out its obligations by selecting exclusively from among its own funds, alleviating Aon from any

obligation to consider non-proprietary options. PSOF ¶¶ 114-115. Members of the Committee testified that they did not know about the terms of the Investment Management Agreement or its amendment and did not discuss granting Aon the authority to consider only proprietary options for the Plan. PSOF ¶ 116. Moreover, Mr. Gartner testified that he did not read either the agreement or its amendment prior to signing them. PSOF ¶ 116.

## V.    THE COMMITTEE TRUSTED, BUT NEVER VERIFIED

The Committee's failure to conduct a diligent investigation when deciding to hire Aon as its delegated fiduciary inhibited its ability to properly monitor Aon's performance in its expanded role. As before, the Committee inappropriately relied on Aon's self-assessments rather than conducting an independent evaluation of Aon's performance. ███████████████

████████████████████████████████████████████████

███████████████

▪  ████████████████████████

▪  ████████████████████████████████████
████████████

▪  ████████████████████████

▪  ██████████████████████████

▪  ██████████████████████████

▪  █████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Because the Committee failed to independently monitor Aon's performance as an investment manager, the Committee failed to uncover when Aon's investment consultants

withheld or embellished the truth. For example:

███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████ When presented with Aon's internal emails at his deposition, Mr. Chilman reflected, "I remember the discussions around adding things into the portfolios, but not a fundamental change in investment thesis . . . . [This] makes it sound a lot more severe than it felt when I was inside the committee." PSOF ¶ 137.

███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████



Remarkably, less than one month later, Aon's fiduciary consultants sang a different tune, advising the Committee of Aon's conclusion that it would be in the "best interests" of the participants and beneficiaries "to make no changes to the investments" at that time. PSOF ¶ 143.

And luckily for Aon, despite clear frustrations with the poor performance of the Plan's funds, the Committee's incredibly slow pace resulted in essentially that: no changes for another four years. For example, although the Committee "agreed to move forward with issuing RFPs for the FGA pension and 401(k) plans" on July 14, 2017, the Committee did not vote to engage a consultant to administer the RFP until September 5, 2019, over two years later. PSOF ¶ 152. Almost as soon as the consultant was hired, the process was postponed. PSOF ¶ 154.

After spurts and false starts, the RFP process that the Committee initiated in July 2017 finally resulted in the selection of a new delegated fiduciary on December 6, 2021. PSOF ¶ 156.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

## **ARGUMENT**

"Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In making its assessments, a court may not make credibility determinations or weigh the evidence. *Laster*, 746 F.3d at 726.

Because the duty of prudence imposed by ERISA concerns a standard that is fact-specific, courts regularly conclude that summary judgment on the issue of liability is "[r]arely ... appropriate." *See, e.g.*, *Terraza v. Safeway Inc.*, 2019 WL 12872958, at *3 (N.D. Cal. Apr. 16, 2019); *see also Cates v. Columbia Univ.*, 2019 WL 8955333, at *13 (S.D.N.Y. Oct. 25, 2019); *Cryer v. Franklin Res., Inc.*, 2018 WL 6267856, at *9 (N.D. Cal. Nov. 16, 2018); *Bd. of Trustees of S. California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon Corp.*, 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011).

Summary judgment is also inappropriate where expert testimony creates a genuine issue of fact on issues such as common industry practices and the standard of care. *See, e.g.*, *Seawell v.*

*Brown*, 2010 WL 4683952, at *6–7 (S.D. Ohio Nov. 10, 2010); *see also Dilts v. United Group Servs., LLC*, 500 Fed. Appx. 440, 449 (6th Cir. 2012); *Tracey v. Massachusetts Inst. of Tech.,* 404 F. Supp. 3d 356, 363 (D. Mass. 2019) ("[O]pinions of the parties' experts as to the proper industry protocol ... are in stark contrast. Both parties also present competing narratives surrounding the decision not to conduct an RFP. Because those disputes are more than superficial, the Court concludes that they are best resolved at trial.").

## I.     THE COMMITTEE FAILED TO UTILIZE A PRUDENT PROCESS FOR SELECTING AON AS THE PLAN'S DELEGATED INVESTMENT MANAGER

The undisputed facts concerning what the Committee did and did ***not*** know, ask, or consider when they selected Aon to be the Plan's delegated investment manager clearly establish that the Committee failed to make "a careful and perspicacious choice." *Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 843 (6th Cir. 2003). ERISA requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether the investment succeeded or failed." *Mohler v. Unger*, 1994 WL 1860578, at *13 (S.D. Ohio Aug. 26, 1994); *Forman v. TriHealth, Inc.*, 40 F.4th 443, 448 (6th Cir. 2022); *Pfeil*, 806 F.3d at 384–85. Thus, a court must focus "not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Chao*, 285 F.3d at 426 (quoting *Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir. 1996)).

The record here is replete with evidence demonstrating that the Committee did not "make an independent inquiry into the merits of [Aon's candidacy]." *Mohler*, 1994 WL 1860578, at *13. Rather, they rushed through this decision in a single meeting without all members present and

without any advanced notice that this issue would be discussed and put to a vote. In their haste, they did not obtain information about competitors in the DC delegated marketplace; question Aon's experience as a delegated fiduciary for defined contribution plans or ask if Aon had other delegated fiduciary clients; probe into Aon's experience and qualifications for designing and managing target date funds; or explore whether Aon would be willing to serve as a delegated fiduciary without changing the Plan's existing lineup.[3] Nor did they question the empty promises of proposed fee savings that Aon included in its pitch. And—inconsistent with FGA's own fiduciary practices—the Committee did not consider issuing an RFP or hiring an independent advisor to guide the Committee through this monumental decision. Instead, they simply listened to Aon's sales pitch and immediately voted to hire Aon with no further due diligence. On this record, there is no basis to conclude that the Committee "investigated its alternatives and made a considered decision" to hire Aon. *Forman*, 40 F.4th at 453 (quotation omitted); *see also Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064–65 (M.D. Tenn. 2018) ("Defendants' failure to secure competitive bids under these circumstances was not consistent with that of a prudent man or woman acting in a like capacity. Whether it was actually imprudent involves questions of fact[.]").

Without an objective basis to rely on, Defendants repeatedly seek to justify their conduct based on their good-faith "belief" that Aon was qualified and capable of fulfilling this new role, pointing to their "comfort" with their existing "trusted advisor." *See* Memorandum in Support of the FGA Defendants' Motion for Summary Judgment, ECF No. 108 ("Defs' Memo") at PAGEID

---

[3] The Defendants' persistent attempts to downplay the differences between advising Plan fiduciaries in a consulting role versus actively designing and managing investment funds only underscores how little the Committee understood about the role they hired Aon to perform. ███████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████

4141, 4159, 4160, 4163, 4169, 4172 (repeating numerous items that the Committee "believed" but did not verify). But ERISA's process-based prudence standard "is not a search for subjective good faith—a pure heart and an empty head are not enough." *Chao*, 285 F.3d at 437 (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)). "[M]erely having a 'firmly held belief' on the wisdom of a course of action or honestly employing one's own 'best thinking' . . . is not sufficient, standing alone, to satisfy [one's] fiduciary duty. If it was, then the standard for fiduciary duty would simply amount to establishing good faith. More is required." *See Reetz v. Lowe's Cos. (Reetz II)*, 2021 WL 4771535, at *46 (W.D.N.C. Oct. 12, 2021); *see also Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 218 (D. Mass. 2020) ("The apparent belief on the part of the Plan Fiduciaries ... does not provide a defense, because they failed closely to investigate the available documentation to confirm that this belief was true.").

This case demonstrates why an untested and unsubstantiated belief is insufficient. █████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████ Similarly, despite the Plan's legacy T. Rowe Price target date funds performing at or near the top 1% of all peer TDFs, the Committee apparently accepted without question Aon's representation that its new, untested, and as-of-then undeveloped proprietary TDF suite would deliver an additional 50 basis points per year over the legacy TDFs. PSOF ¶ 94-97. Even when dealing with an impartial advisor, ERISA fiduciaries have an obligation to independently evaluate the basis for the advice, as "no fiduciary may passively rely on information provided by a co-fiduciary." *Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 286 (S.D.N.Y. 2018). All the more so here, where Aon labored under a conflict of interest that

incentivized it to offer self-interested advice. *See Gregg*, 343 F.3d at 841 ("One extremely important factor is whether the expert advisor truly offers independent and impartial advice.").

The fiduciaries of other plans, when presented with Aon's sales pitch, exhibited far more diligence, ███████████████████████████████████████████████████

████████████ This evidence is corroborated by the opinion of Plaintiffs' expert, Samuel Halpern,

███████████████████████████████████████████████████████████████

████████████████[4] Presented with similar facts, courts around the country have reached the same conclusion. *See, e.g.*, *Reetz II*, 2021 WL 4771535, at *58 (failure to perform "any real due diligence or comparison of alternatives before selecting Aon to be the Plan's delegated fiduciary investment manager"), *appeal docketed on other grounds*, No. 21-2267 (4th Cir. Nov. 10, 2021); *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 358–60 (4th Cir. 2014) (reliance on "unconfirmed assumption[s]" and exhibiting a "lack of effort"); *Liss v. Smith*, 991 F. Supp. 278, 300, 313 (S.D.N.Y. 1998) (failure "to investigate proposed investments" and "to solicit and consider competitive bids from other service providers" and explaining "[a]t the very least, trustees have an obligation to (i) determine the needs of a fund's participants, (ii) review the services provided and fees charged by a number of different providers and (iii) select the provider whose service level, quality and fees best matches the fund's needs and financial situation.").

Defendants emphasize that three committee members discussed Aon's nascent delegated fiduciary service for DC plans prior to the full Committee meeting on May 22, 2013. But the actual record is hardly compelling. Neither Mr. Young nor Mr. Gartner had any recollection of any of these discussions. PSOF ¶ 87. Mr. Chilman similarly recalled virtually nothing about the

---

[4] Of course, Defendants offer a contrary opinion from their expert. But these "competing expert opinions present the classic 'battle of the experts' and it is up to [the factfinder] to evaluate what weight and credibility each expert opinion deserves." *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (quotation omitted).

discussions, other than that he received a draft presentation from Aon and provided feedback on the presentation. PSOF ¶ 88. Other Committee members were not even told about these discussions. PSOF ¶ 89. This scant record falls far short of establishing as a matter of law that the Committee satisfied ERISA's "high standards" by engaging in a "thorough[] … investigation into the merits of" Aon's proposal. *Chao*, 285 F.3d at 426 (quotation omitted).

Finally, Defendants urge this Court to consider each omission in isolation. But that is not the standard. Rather than asking whether the "failure to take any of these steps, standing alone, would constitute such imprudence as to violate a fiduciary's duty," Defendants' conduct is considered under the totality of the circumstances. *Davidson v. Cook*, 567 F. Supp. 225, 237 (E.D. Va. 1983), *aff'd sub nom. Accardi v. McGuire, Woods & Battle*, 734 F.2d 10 (4th Cir. 1984). Considered in context, it becomes clear that "[Defendants'] omissions together do . . . constitute such neglectful practice that the Court cannot conclude a prudent investor in similar circumstances would have acted in the same manner." *Id.*; *accord, e.g.*, *Cryer*, 2018 WL 6267856, at *9 ("A trier of fact could reasonably view the discussion in the August 14, 2012 meeting insufficient to disprove a breach of Defendants' fiduciary duties because the [Committee] failed to adequately weigh the costs and benefits of [its decision]."); *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *10 (C.D. Cal. Aug. 14, 2019) (same); *Sacerdote v. N.Y. Univ.*, 1:16-cv-06284, Dkt. 174 (S.D.N.Y. Feb. 22, 2018) ("It is clear that the remaining issues in this case implicate questions of fact. The questions of whether NYU's actual processes and conduct were prudent cannot be resolved on motion given the state of the factual record (including contradictory expert views on the topic)."); *Reetz v. Lowe's Cos. (Reetz I)*, 2021 WL 535160, at *2 (W.D.N.C. Feb. 12, 2021) ("Who has the better evidence? Where does the truth truly lay? These questions cannot and should not be determined on cross-motions for summary judgment."); *Sims v. BB&T Corp.*, 2018

WL 3128996, at *7–8 (M.D.N.C. June 26, 2018) (noting that plaintiffs "rely on both internal ... documents and expert opinion testimony that the ... process used to select and evaluate funds was inconsistent with industry practices.... The plaintiffs have established disputed questions of material fact on whether the defendants breached their fiduciary duties of prudence[.]").

## II. THE COMMITTEE FAILED TO APPROPRIATELY MONITOR AON AND THE AON FUNDS

The Committee's hasty decision to hire an inexperienced investment manager with brand new, untested funds created additional problems when those funds immediately and persistently underperformed. An ERISA fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). Here again, the record more than adequately shows that the Committee failed to recognize its error and take timely corrective action, unreasonably delaying replacement of Aon and the Aon funds until 2021.

The Committee's monitoring process suffered from several flaws. *First*, because the Committee did not recognize that Aon's dual role as the Plan's advisor and delegated fiduciary created an obvious potential for conflict, the Committee relied on Aon's investment advice without "mak[ing] certain that reliance on [Aon's] advice [was] reasonably justified under the circumstances." *Gregg*, 343 F.3d at 841; *Chao*, 285 F.3d at 430 (citing *Howard*, 100 F.3d at 1489). Particularly against the backdrop of the IMA amendment—which purportedly authorized Aon to fulfill its delegated fiduciary mandate exclusively with proprietary funds without considering non-proprietary alternatives—the Committee's decision to passively rely on Aon for advice was especially suspect. Aon's fiduciary advisors "[were] not an objective analyst any more than the same real estate broker can simultaneously protect the interests of both buyer and seller or the

17

same attorney can represent both husband and wife in a divorce." See *Gregg*, 343 F.3d at 842. In contrast, at least one similarly situated fiduciary "took notice of the potential conflict posed by Aon's dual positions as the Plan's investment consulting fiduciary and investment manager," and retained an independent consultant to advise on Aon's performance. *Reetz II*, 2021 WL 4771535, at *37. ████████████████████████████████████████████

████████████████████████████

*Second*, ERISA's duty to investigate requires fiduciaries "to review the data a consultant gathers, to assess its significance and to supplement it where necessary." *Gregg*, 343 F.3d at 843; *Ramos v. Banner Health (Ramos II)*, 461 F. Supp. 3d 1067, 1124 (D. Colo. 2020), *aff'd (Ramos III)*, 1 F.4th 769 (10th Cir. 2021). Here, Aon's consultants did not volunteer metrics necessary to evaluate Aon's performance as an investment manager, and the Committee did not ask for them. PSOF ¶ 133. Thus, the Committee could not perform its duty to monitor Aon independently and was entirely reliant on performance narratives that were filtered through Aon's conflicted consultants for the majority of the class period. PSOF ¶ 133.

*Third*, the Committee failed to respond to key warning signs, and did not recognize that the TDFs were not performing according to their design, or that the overhauls that Aon made throughout the class period evinced a "fundamental change" in Aon's investment thesis. PSOF ¶ 137. If the Committee had been closely monitoring the extent of the design changes and their outcomes in real time, it would have uncovered that the funds' chronic underperformance was a symptom of a larger problem: Aon itself.

*Finally*, the Committee was not timely with its corrective actions. The record reflects that Committee members were dissatisfied with the Aon funds almost immediately upon their introduction to the Plan and continued to be so throughout the class period. PSOF ¶ 148. For

example, one Committee member testified that she was "concerned" about the funds' performance at approximately the one-year mark, not "on board" with the Aon funds by January 2016, was "so ready to be done with Aon" by July 2019, and agreed that the "funds suck" in August 2020. PSOF ¶ 148. Yet despite these concerns, the Committee failed to act. As Mr. Halpern explains, ██

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████

Moreover, the Committee members' own testimony evinces that their failure to take corrective action was not the result of a reasoned and considered decision to retain Aon, but due to a lack of attention. For example, when asked why the funds were retained for so long, Ms. MacAndrew explained, "there was a lot of activity going on with Greyhound being up for sale, and the Student and Transit being put on the market. So I would say a lot of those things were impacting, probably, the focus more so than it should have at the time." PSOF ¶ 156. Similarly, Mr. Gartner testified that his role on the Committee was "a minor part of the job, which [he] obviously didn't care enough about." PSOF ¶ 156.

Defendants seek refuge in the frequency and regularity of Committee meetings. But "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not . . . suffice in every case[.]" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 111 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022). "In assessing whether a fiduciary fulfilled her duty of prudence, we ask whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment, not merely whether there were any methods whatsoever." *Id.* (quotation omitted). Accordingly, genuine issues of material fact remain

concerning the adequacy (in substance and in speed) of the Committee's process for reviewing the Plan's investments and investment manager. *See, e.g.*, *Garthwait v. Eversource Energy Co.*, 2022 WL 3019633, at *18 (D. Conn. July 29, 2022) (denying summary judgment, noting "[w]hether the defendants breached their duty of prudence depends on several contested issues of fact[.]"); *Ramos v. Banner Health (Ramos I)*, 2019 WL 1777524, at *10 (D. Colo. Apr. 23, 2019) ("The parties offer differing views of what a prudent process would be for responding to and evaluating the Freedom Funds as of 2011. Such evidence is sufficient to create a genuine dispute of material fact that must be resolved at trial."); *Cates*, 2019 WL 8955333, at *13 (S.D.N.Y. Oct. 25, 2019) ("[T]here are questions of fact as to whether a prudent fiduciary would have removed the investments, and when, based on the alleged underperformance."), *R. & R. adopted*, 2020 WL 1528124, at *5 (S.D.N.Y. Mar. 30, 2020) ("Plaintiffs have proffered ample evidence for a jury to find that a prudent fiduciary would have removed the investments at an earlier date."); *Terraza*, 2019 WL 12872958, at *5.

## III. THE FGA DEFENDANTS' BREACHES UNDOUBTEDLY RESULTED IN A LOSS TO THE PLAN

Plaintiffs have also satisfied their burden to "show a causal link between the failure to investigate and the harm suffered by the plan." *Kuper v. Iovenko*, 66 F.3d 1447, 1460 (6th Cir. 1995), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014). "Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008).

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

Defendants contend that these loss calculations are not "consistent with [Plaintiffs'] theory of liability," but that is plainly not so. At the very meeting during which the Committee hastily accepted Aon's sales pitch, the Committee and its Aon consultants also reviewed the Plan's Legacy Fund lineup and "determined that it would be in the best interests of the participants and beneficiaries in the 401(k) Plan to make no changes to the investments in the 401(k) Plan at this time." PSOF ¶ 170. The Committee reached this same conclusion regarding the legacy lineup at its next meeting in August 2013, after it had voted to engage Aon but before the change to Aon's funds has occurred. PSOF ¶ 170. Based on this evidence alone, a reasonable factfinder could conclude that, had Defendants not hastily and imprudently engaged Aon as a delegated fiduciary, the Plan's legacy lineup—including the best-in-class T. Rowe Price TDFs—would have remained intact. And in any event, the record is replete with additional evidence supporting a finding that but-for the Committee's rash and spontaneous decision to hire Aon as the Plan's investment manager, the Committee would have retained its Legacy Funds. PSOF ¶¶ 47, 171.

Ample evidence in the record also supports the use of the State Street TDFs as comparators.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ ████████████ Courts have long recognized that passively managed index funds are "an appropriate comparator for loss calculation purposes." *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 31 (1st Cir. 2018). Thus, the passively managed State Street TDFs are a reasonable alternative comparator for what a prudently retained investment manager would have selected (or recommended as an advisor) for the Plan.

Defendants' arguments to the contrary hinge on a misrepresentation of Mr. Halpern's opinions. Mr. Halpern does *not* opine—as Defendants suggest—that the Committee "*would* have selected a different company as delegated investment fiduciary." Defs' Memo at 24. Mr. Halpern testified: █████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████ Nothing about Mr. Halpern's fundamental conclusion, that a prudent fiduciary ██████████████████████████████████████ is inconsistent with Dr. Becker's various damages models.

Similarly, with regard to the Committee's failure to prudently monitor Aon, ███████████ ████████████████████████████████████████████████████████ ████████ It is therefore not inconsistent with Plaintiffs' theory of breach to begin calculating damages as of that date. To the extent the Court determines that a different start date should apply, it is within the province of the Court to "fashion its own measure of loss resulting from the breach." *Ramos III*, 1 F.4th at 778 (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1055 (2d Cir. 1985)). And "to the extent that there is any ambiguity in determining the amount of loss in an ERISA action,

the uncertainty should be resolved against the breaching fiduciary." *Sec'y of U.S. Dep't of Lab. v. Gilley*, 290 F.3d 827, 830 (6th Cir. 2002). At most, Defendants arguments presented with genuine factual disputes that must be resolved at trial. *See, e.g., Baird v. BlackRock Inst. Tr. Co.*, 2021 WL 105619, at *3 (N.D. Cal. Jan. 12, 2021) ("Defendants' loss causation arguments also involve weighing the credibility of the parties' respective experts and their methodologies, a task which is inappropriate at the summary judgment stage.") (citations omitted); *Terraza*, 2019 WL 1589979, at *1 (denying the Safeway Defendants' motion for summary judgment on the issue of loss causation, explaining "[if Defendants' conduct was imprudent], then the Court will determine whether there were comparable assets the [Committee] could have offered Plan participants that would have performed better. [Plaintiff] has identified such assets; whether they are fair comparators is an issue the Court will resolve at trial.").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court deny the FGA Defendants' Motion for Summary Judgment as to Count I, concerning the breach of the duty of prudence.

Dated: November 18, 2022    Respectfully submitted,

**NICHOLS KASTER, PLLP**
By: */s/ Brock J. Specht*

Paul J. Lukas, *admitted pro hac vice*
Brock J. Specht, *admitted pro hac vice*
Matthew H. Morgan, *admitted pro hac vice*
Anna P. Prakash, *admitted pro hac vice*
Steven J. Eiden, *admitted pro hac vice*
Patricia C. Dana, *admitted pro hac vice*
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
bspecht@nka.com
morgan@nka.com
aprakash@nka.com
seiden@nka.com
pdana@nka.com

**FREKING MYERS & REUL**
George M. Reul, Jr. (OH 0069992)
600 Vine Street, Suite 900
Cincinnati, Ohio 45202
Telephone: 513-721-1975
Facsimile: (513) 651-2570
greul@fmr.law

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, Brock J. Specht, hereby certify that I served this document on counsel of record via ECF on November 18, 2022.

*/s/ Brock J. Specht*
Brock J. Specht